506 F.Supp. 147 (1980)
INTERNATIONAL SOCIETY FOR KRISHNA CONSCIOUSNESS, INC., on Behalf of Themselves and All International Society for Krishna Consciousness Members, and Alan Attias, a/k/a Aja Dasa, and Kenneth L. Solomon, a/k/a Kesihanta, Plaintiffs,
v.
J. Roger BARBER, in his official capacity as Commissioner of the Department of Agriculture and Markets of the State of New York, and Thomas G. Young, Director of the New York State Industrial Exhibit Authority, and James G. Garlick, Acting Director of the New York State Industrial Exhibit Authority, Defendants.
No. 77 CV 328.
United States District Court, N. D. New York.
August 25, 1980.
*148 Faith A. Seidenberg and Bonnie Strunk, Seidenberg & Strunk, Syracuse, N. Y., of counsel; Larry J. Roberts, Robert C. Moest, Barry A. Fisher Law Offices, Los Angeles, Ca., on the briefs.
Robert Abrams, Atty. Gen. of the State of N. Y., New York City, for defendants Barber and Young; Thomas J. Maroney, Asst. Atty. Gen. in Charge, Syracuse, N. Y., George M. Levy, Asst. Atty. Gen., Syracuse, N. Y., of counsel.
Bradley J. Carr, Syracuse, N. Y., for defendant Garlick.

MEMORANDUM  DECISION AND ORDER
MUNSON, Chief Judge.

I.
The First Amendment is dedicated to the proposition that a citizen's right to form, hold, or express opinions or beliefs is entitled to an accommodation from the government whenever possible. This principle embodies certain fundamental social decisions about the type of society that would be created as a result. One such decision concerns our society's attitude towards its discordant voices. Every society seeks, to varying degrees, to manage the forces of social unrest within its borders. The First Amendment envisions a system by which social order can be achieved by channeling this unrest through self-expression, rather than by trying to suppress individuals who espouse ideas that are unpalatable to the majority of the citizenry.
*149 As a practical corollary, however, there will be times when this accommodation will favor society's interest in protecting itself as a whole. For instance, if spoken in a particular setting or at certain times, the message of a speech may be so dangerous that it ought to be regulated or even prohibited for the good of all citizens. Society cannot tolerate a person yelling "fire" in a crowded theater when there is no fire. At the same time, there will be occasions where the manner in which speech is presented may require regulation for the greater good of society. Thus, a prohibitory rule is appropriate to guard against the con man who would have the unwary believe that he solicits for the benefit of both widow and orphan when, in reality, he desires only to improve his own treasury.
These examples enjoy the benefit of being clear cut. In the typical situation, however, it is harder to determine where the rights of one group should end and where the rights of another should begin. Frequently, courts are required to evaluate whether, in balancing the rights of individuals, governmental entities have reached a constitutionally permissible result. In the course of exercising this responsibility in the past, courts have often strained to reach judgments, have arrived at opposite conclusions, and have covered their tracks, in the words of Supreme Court Justice Jackson, with the "pronouncement of general propositions with which there is no disagreement."[1]
In the view of one noted legal commentator,[2] though clearly formulated rules in this area are essential, the courts' difficulties in the First Amendment arena are understandable. Says he, our system of free expression contemplates that "[t]he members of society must be willing to sacrifice individual and short-term advantage for social and long-range goals." Continuing on, he states: "[y]et, because [this system] recognizes the right of the citizen to disagree with, arouse, antagonize, and shock his fellow citizens and the government, such an arrangement of human affairs is hardly likely to be automatically achieved."[3]
While the Court agrees with the latter proposition, it cannot accept the former as being correct. In the same opinion, partially quoted from above, Justice Jackson said: "[c]ivil liberties had their origin and must find their ultimate guaranty in the faith of the people."[4] There is a "good faith" limit to the number of times that the majority of society can be asked to forsake their liberties in favor of some small group which claims that their beliefs or opinions compel this result. Hence, exceptions such as these must be very narrowly drawn, and should reflect our common sense and fundamental values. In the past, all too often judgments in this field have not; and they have substituted a certain transcendental consciousness of their own for practical solutions.
Such a judicial legacy will not only fall of its own weight, it will make it more difficult for communities to find practical solutions to constitutional problems. The ultimate danger in this course is clear. Soon, a society's long-range social goals will become casualties of short-sighted convenience, and the people will lose faith in the meaning of their liberties. Moreover, the end will have been hastened by a willingness of courts to replace common sense and values with outmoded legal theories, whose combined effect is to grant selected minorities the license to write their own code of conduct at the expense of the rights of others. While questions of free expression or religion commonly require the courts to seek practical solutions, we need not reach judgments as did Plato's men, who were chained in a cave and only able to see their shadows. There may come a time when a minority group seeks constitutional favoritism that in common sense terms is neither justified, *150 nor is in the interests of society as a whole. At such times, this Court is duty bound to reject such a request. By way of concluding these remarks, again the words of Justice Jackson:
The First Amendment grew out of an experience which taught that society cannot trust the conscience of a majority to keep its religious zeal within the limits that a free society can tolerate. I do not think it any more intended to leave the conscience of a minority to fix its limits. Civil government cannot let any group ride rough-shod over others simply because their "consciences" tell them to do so.[5]
This action began with the International Society for Krishna Consciousness (hereinafter referred to as Krishnas) and one of its members, Alan Attias, filed a complaint in the Northern District of New York on August 29, 1977, the day before the 1977 New York State Fair was to begin. The Krishnas are a duly organized not-for-profit corporation, incorporated under the laws of the State of New York, with their main branch located in New York City, and with various temples located throughout the United States and the world. As originally joined, the defendants in this action were Hugh L. Carey, sued individually and as Governor of the State of New York; J. Roger Barber, sued individually and as Director of the New York State Department of Agriculture and Markets; and Thomas G. Young, sued individually and as Director of the New York State Fair.
The gravamen of the plaintiffs' 1977 complaint was that the New York State Fair's booth regulation prohibited the Krishnas from freely circulating at the Fairgrounds, and practicing a Krishna ritual known as Sankirtan. According to Krishna custom, Sankirtan requires that a devotee proselytize the Krishna religion and solicit monies for its support. The booth restriction, said plaintiffs, violated the Krishnas' First and Fourteenth Amendment rights of free speech, free exercise of religion and peaceable assembly. In their prayer for relief, the Krishnas sought a temporary restraining order preventing defendants from refusing the Krishnas unlimited access to the Fairgrounds. This order was subsequently granted by the Honorable Edmund Port, Senior Judge of this District, on August 30, 1977. Prior to the filing of the complaint, the New York State Fair had not yet formally reduced its booth regulations to writing. However, such regulations were drawn up and printed after this suit was commenced. It should also be noted that the State Fair is a cooperative enterprise between two public agencies. One is the Division of the State Fair of the State Department of Agriculture and Markets, and the other is the New York State Industrial Exhibit Authority. Both agencies are involved in this action because each has rule-making authority which plaintiffs contest.
Although the 1977 complaint was never dismissed, one day before the 1978 New York State Fair was scheduled to begin, the Krishnas and Krishna devotee Nicholas D'Angelo filed a second complaint, seeking another temporary restraining order to enjoin the defendants from enforcing the booth requirement at the 1978 State Fair. This Court heard oral argument on August 28, 1978, and granted plaintiffs' relief effective through September 1, 1978, which allowed plaintiffs access to the Fairgrounds subject to some twenty-one conditions which were standard stipulations that plaintiffs propose to courts and various defendants in this type of litigation around the country. In general, the restrictions relate to the type of activity in which devotees engage; registration and liaison procedures; fees and the manner and place of the activity. The order was subsequently extended for the duration of the Fair, and it was partially modified to exclude the Krishnas from the building known as the Cow Barn.
On January 12, 1979, defendants filed their answer to the 1977 complaint. Thereafter, by notice of motion dated July 20, *151 1979, plaintiffs moved for summary judgment, and oral argument was heard on July 30, 1979. The Court eventually denied the motion, believing that a full trial of the issue was necessary. On August 28, 1979, Judge Port signed still another temporary restraining order embodying the same twenty-one conditions as this Court's Order, and it was to be in effect until a motion for a preliminary injunction could be heard. Later that day the temporary restraining order was vacated until such time when all counsel could be present for a hearing on the preliminary injunction which was set for August 30. Between those dates, no Krishna was to enter the Fairgrounds to perform Sankirtan. One did, however, and was arrested, and later banished from the Fairgrounds by Judge Port. The temporary order was reinstated on August 30, and the Judge dictated his decision into the record the next day granting a preliminary injunction. Plaintiff subsequently moved for summary judgment on November 28, 1979, and this motion was held over by the parties on agreement that it would be renewed on April 21, 1980, which was the date set for trial on the merits.
The trial began as scheduled, plaintiffs renewed their motion for summary judgment, and it was denied. Other motions were also disposed of at that time. These included plaintiffs' motion to add Kenneth Solomon as a party and to dismiss the action as to Governor Carey, Commissioner Barber, and Fair Director Young in their individual capacities. The trial lasted 11 days, 1500 pages of testimony was taken, and 44 witnesses were called by the parties. These included religious experts, a "de-programmed" Krishna, and a number of state and county fair officials from around the country. Before examining the facts in dispute, some further background on the State Fair will prove useful.
The New York State Fairgrounds are located in the Town of Geddes, just outside the City of Syracuse. The total area of the grounds, including the large parking lots outside the gates and the various open spaces is approximately 350 acres. (Garlick, pp. 129, 130). The area within the gates of the Fairgrounds comprises something less than 40 acres. This is the area housing all of the many structures as well as areas of pedestrian traffic, and the 40-acre figure includes the large grandstand area and the infield parking area. After deducting the acreage of the race track, grandstand, and the infield parking area, one is left with the Fairgrounds proper, a total of approximately 20 acres within which the actual exhibits and pedestrian walkways are found.
Attendance at the New York State Fair has increased steadily since 1977. That year, the duration of the Fair was seven days and the total attendance was approximately 526,000. In 1978, the duration of the Fair was increased to ten days, and the total attendance was approximately 686,000. In 1979, when the Fair was again ten days, total attendance was approximately 701,000.
The bulk of exhibitors at the New York State Fair represent the best examples of the fine agriculture and progressive industry found within the State of New York. Also included among the exhibitors are representatives of various religious, fraternal, or political groups which communicate their ideas to the public attending the Fair. Exhibitor space has consistently been rented to groups such as Right-to-Life, Planned Parenthood, Seventh Day Adventists, Lutheran Laymen's League, the Knights of Columbus and many others. Many of these groups were soliciting contributions to help their cause and all were confined to booths during the course of the Fair. The Court now turns to an examination of the Krishna religion and the practice of Sankirtan.

II.
The International Society for Krishna Consciousness is a religious organization that traces the origins of its beliefs to the Vaishnava Tradition of Bhakti Hinduism, which was formalized in the ninth century, A.D., in southern India. The scriptural source of this Tradition are the ancient Vedic literatures. Included among these scriptures are the Samhita and the Upanishads, *152 which are the canonical mainstays of the Vaishnava tradition, and the acceptance and belief in these scriptures are incumbent on authentic followers.
The Samhita and Upanishads are referred together as the aShruti, signifying that their contents were first heard by the sages, as revealed to them by the Lord. The other writings of the Tradition are called the eSmriti, which are the commentaries on the aShruti. These are noncanonical or "secondary" texts, whose interpretations are not considered to be binding on the faithful. The more significant religious works studied by the Krishnas descend from the eSmriti, such as the Srimad Bhagavatam, and the Bhagavad-Gita.
Although the Krishnas identify the roots of their beliefs as being centuries old, the organizational beginnings of their Society in this country are as recent as the mid-1960's, when the Spiritual Master A.C. Bhaktivedanta Swami came to this country from India at the behest of his Spiritual Master, and started a small temple in New York City. Bhaktivedanta Swami was eleventh in the chain of disciples of the Chaitanya movement of Bengal in northeastern India. The central figure in that movement was the Sage Chaitanya who lived from 1486 to 1533, and was understood to be an incarnation of God or Krishna. It is said that Lord Chaitanya was able to unlock the message of God for the masses, and he proclaimed that one day his name would be chanted in every town and village in the whole world. The book describing his life, the Sri Caitanya Caritamrta, is considered part of the Krishna scriptures.
It would appear that as a result of Lord Chaitanya's proclamation, a fundamental responsibility of the modern Krishnas is to practice Sankirtan, a missionary type of practice, in which the Krishnas proselytize their faith and solicit contributions. In its present usage, however, the term Sankirtan describes a religious rite vastly different from its original meaning in the Vaishnava Tradition. In premodern times, the Hindus did not believe that their religions should be aggressively proselytized throughout the general population. Furthermore, although solicitation was conducted by the Hindus, it was not considered to be a part of Sankirtan, and it was not practiced by the more religious members of the Hindu orders. A further comparison of the traditional and present forms of Sankirtan will be useful.
The origins of Sankirtan date back to the ninth century, A.D., when it is first referred to in the Srimad Bhagavatan, at a time when the notion of personal devotion to the deity was beginning to evolve. It was next mentioned in the Bhagavad-Gita some five hundred years later, and was then practiced in the form of ritualized movements, accompanied by the repetitious chanting of God's name. The central purpose of Sankirtan was to get closer to God and involve others in such worship. Solicitation for support of the religion seemed equally ritualistic, and took two forms  solicitation to guarantee survival, and solicitation to support the construction of edifices. In either case, solicitation was rarely performed by the monks or the initiated faithful. Rather, this chore was shouldered by lay specialists who functioned as managers of the religion.
When approaching potential donors, these specialists were required to depend on "true speech and gentle speech." Moreover, they were immediately to identify their religious order and guru. Money could not be asked for directly, instead, the specialist would ask only for a contribution of food sufficient in amount to fill the outstretched palms, or enough clothing to enable survival under a tree. It was this fact that money was not asked for directly which separated those who were religious beggars from those who were not. Also, in the course of asking for a contribution, a prospective donor could never be touched without their permission. If money was needed to build an edifice, an announcement to that effect was made in the community, and the lay followers and others, such as the Maharajas and kings, would be asked to contribute. To summarize, traditionally, the practice of Sankirtan was considered a pure religious ritual, and was set completely apart both in principle and practice from the necessity to solicit funds for the religious support.
*153 As already mentioned, the modern Krishnas have expanded the role of proselytizing in the religion, and have incorporated the solicitation of money into the practice of Sankirtan. It should be noted, however, that they have not excluded from the definition of Sankirtan, the traditional dancing and chanting which is still practiced today, though it is not the subject of this litigation. Nevertheless, in the process of redefining Sankirtan, the theoretical underpinning appears to have shifted dramatically from its traditional sense. As presently conceived by the Krishnas, Sankirtan is the process of propagating the "truth" of Krishna. The Krishnas profess that nonbelievers in the Lord Krishna are misguided souls who are spiritually impure because they attempt to exploit the Lord's material wealth for their own personal gratification.
To achieve a spiritual rebirth, divine instruction and full surrender to the Lord is necessary. The surrender takes the form of giving up material possessions to the Krishnas for use in the service of the Lord, and for the support of the religion. The more material objects a person gives up  objects that are diverted from self-gratification towards the service of the Lord  the more the soul becomes purified. The process of purification is said to take place as soon as the material transfer is made. As a consequence, it is not significant, according to the Krishnas, that an individual understand the purpose of the donation. As stated succinctly by the Krishnas in one of their publications, they believe that "[t]he consciousness of the majority of people in present societies (including American) necessitates their donation of money to the Lord, Sri Krishna's service, for their spiritual purification and to provide the required means to ISKCON's sankirtan work." [Appendix A to Plaintiffs' Trial Brief at p. 1].
To be a devotee of Krishna means to totally surrender personal material possessions, to take up the Lord's service, and to attempt to get others to surrender as well. The materially conditioned souls, or karmi, are viewed as diseased patients who, with the proper spiritual administrations by the doctoring Krishna devotee, will be able to return to spiritual health. In practice, the process of administering to the misguided souls is conducted wherever such souls tend to congregate. Thus, Krishnas are "dispatched" in organized parties varying in numbers, and headed by a Sankirtan leader. The parties are sent to the streets, airports, bus terminals, expressway rest stops, shopping centers, parks, national monuments, naval bases, convention centers, football games, horse and auto race tracks, college campuses, and to state and county fairs. This list is certainly not all inclusive. While Sankirtan parties are usually dispatched from a Krishna temple to a predetermined location such as those just enumerated, the Sankirtan leader is given discretionary authority to spread the "truth" at whatever locale will enable the party to reach the maximum numbers of people.
There is, nonetheless, a territorial limit to a Sankirtan party's wanderings. Each Krishna temple or farm is assigned a specific territory, and before a Sankirtan party can cross over into another temple's territory, permission must be obtained beforehand. For instance, the plaintiff New York City temple has assigned to it that City, northern New Jersey and the southern most counties of New York State. Yet, with the permission of the respective temples, the New York City temple has dispatched Sankirtan parties to the Eastern States Exhibition in Massachusetts and even to North Carolina for the State Fair in Raleigh. As another example, to "cover" the New York State Fair, the Krishnas have dispatched Sankirtan parties from their farm in West Virginia, their temples in Boston, Buffalo, Pittsburgh, Philadelphia, and a national traveling Sankirtan party called Radha Damodar which was once "based" in Pennsylvania. A temple's territorial allocation is decided by the Krishnas' governing body commission, which consists of twenty-three men representing different "zones" of the world, and overseas matters common to the Society. The plaintiff New York City temple is located in a "zone" which includes the northeastern United States, Puerto Rico and the Caribbean. Over the years as the *154 movement has become more popular, other temples have been founded, and the New York City temple, once the only temple in the United States, has, as a result, seen its assigned territory become smaller and smaller.
Thus far, the Court has discussed why Krishnas are sent among the public and where they are sent; the next question that must be examined is how are they sent, or the methods employed by the Krishnas in their practice of Sankirtan. A considerable amount of testimony on this issue has been presented by both parties, and it has given this Court the opportunity, unlike that of any other court in a case involving the right of the Krishnas to practice Sankirtan, to understand the various methods employed by the Krishnas when performing this religious rite. The plaintiffs' perspective on their Sankirtan methods will be discussed first. This discussion will conclude with the Krishnas' view of their previous experiences at the New York State Fair, and the ways in which the State Fair's booth restriction would affect their ability to practice Sankirtan and exercise their constitutional rights.
From the Krishna point of view, in order to understand how they conduct Sankirtan, picture the following scenario which supposedly occurred frequently at the New York State Fair. A member of the Krishna faith approaches a fair goer, makes an introductory remark, and simultaneously offers a prasada, or some small "sanctified" item such as an artificial flower, or food stuff. The purpose of this offering is to divert the fair goer's attention and thus enable the Krishna devotee to engage the fair goer in a conversation about the Krishna faith. Other items have also been used in the course of this introductory exchange, for example, a stick of incense, candy canes, or buttons. These buttons display various messages on them like "Keep on Truckin", "I Love New York" or have portrayed two racing flags. When a flower or button is used, it is typically pinned on the fair goer's person.
If the fair goer desires to engage the Krishna in a conversation, the Krishna devotee will attempt to sell the interested fair goer a religious book such as the Srimad Bhagavatem, the Sri Caitanya Caritamrta, Bhagavad-Gita As It Is, as translated by A.C. Bhaktivedanta Swami, some other "small book" written by him; or a religious magazine called "Back to Godhead" which is published by the Krishnas; or a religious record produced and recorded by the Krishnas. These records contain religious songs and chanting, and the record jackets acknowledge the contributions made to Krishna "projects" by such recording stars as Bob Marley, Bob Dylan, Stevie Wonder, Alice Coltrane, George Harrison, Richie Havens, and Neil Diamond. Whether or not the fair goer decides to purchase one of these items, the Krishna devotee will ask the fair goer to make a monetary donation. Even if the fair goer does not make a contribution, usually the Krishna devotee would permit the fair goer to keep the prasada or token, and sometimes even the more religious paraphernalia if it had been shown to the fair goer. In this manner, the Krishna devotee spreads the "truth" of Krishna by giving the misguided souls an opportunity to rededicate their material wealth; attempts to disseminate as many books, magazines, and records as possible and obtain donations in order that another copy of these religious works may be reproduced; and, in the end, hopes to induce others to join the Krishna faith.
To learn how to perform Sankirtan, Krishna devotees are schooled by their religious superiors. Certain standard instructions on how to approach the misguided souls are given to Sankirtan parties by the Krishna priests or Brahmans. The Brahmans are instructed in turn by their spiritual masters, who rely on the Krishna scriptures for guidance. The devotees are told to appreciate the philosophical reasoning behind the practice of Sankirtan and to understand the "power" of its meaning. Moreover, they are instructed that, although they should be diligent about the task, they should rely on the Lord for their success. The devotee is instructed to act *155 ideally, truthfully, and not to irritate anyone or touch them without permission. For instance, devotees are admonished never to say that the recording stars actually participated in making the Krishna records. The Krishna devotees are told to inform the public that these stars have helped the Krishnas in a number of their "projects," but that the stars do not perform on these records. The Brahmans tell the devotee to think practically; if they force themselves upon the misguided souls at a particular locale, a scene will result, and most likely the Krishnas would not be permitted to return. One Krishna Brahman summarized the instructions as follows:
Very specifically we stress the point that was spoken by a great saint in our movement, that is in this particular day and age, example is more important than precept. The particulars are that you must behave according to the philosophy that you are trying to preach, and the principles, the qualities a sainted person may be expected to have, thus, you have to be humble, tolerant when people get angry or yell at you or if the authorities do something you may not think right, still you abide by what they say, if someone says no, then you don't repeatedly push them. [Transcript, April 22, 1980 at p. 71]
It must also be remembered that at the New York State Fair, the Krishnas stipulated to a certain code of conduct, that affected the manner, place and time at which they were able to approach fair goers. Due to these stipulations,[6] the Krishnas were to wear identification badges and display them prominently, register with fair authorities, only engage in Sankirtan with those fair goers who agreed, not to touch anyone without their consent, and restrict their Sankirtan activities to certain places and appropriate times.
The Krishna plaintiffs concede that despite taking great care to make certain that devotees act according to the standard instructions and stipulations, there are some "unfortunate incidents" where Krishna devotees violate these principles and guidelines, and these violations may even lead to arrests of devotees. There were, in fact one arrest of a Krishna devotee at the 1977 State Fair, six arrests in 1978, and nine arrests in 1979. Moreover, there were many informal complaints by fair goers against the Krishnas in 1978 and 1979. It is vigorously urged by the Krishnas that "[t]hese violations, if indeed they rose to that level of harm, were not encouraged or even condoned by the Sankirtan leader at the Fair or by those who prepare devotees for proselytizing and soliciting." [Plaintiff's trial brief at p. 19]. In addition, the Krishnas say that if a devotee's conduct causes complaints, the devotee would be removed from Sankirtan duties. The Krishnas provide three explanations for these statistics. According to one Krishna Brahman who testified at the trial, the origin of some of the complaints results from the inexperience of new Krishna devotees:
Well, they are not very confident. They are making a very big transition to become a devotee of Hare Krishna, it is kind of almost like a shock; a new acceptance of authority so they are not very confident and the temple techniques they are not just in a good  they are not as smooth with the people.
If a person is nervous when he is approaching another person, then he will immediately make the other person nervous. I give the example to them when I am training them just like if you approach a dog, the dog will pick up if you are afraid of him and therefore the dog will become aggressive so a lot of the problems with newer devotees doing Sankirtan is that they are not as confident, not as experienced, so their lack of confidence and ability to do Sankirtan would be picked up by the people they are meeting and generally that may cause some complaint, some difficulties.
One other point in that regard, that is actually an important part that as a devotee performs Sankirtan his ability to present whether it is a record or a book *156 or just even meeting and talking to some one improves in terms of being able to actually explain the philosophy because as he, you know, performs his daily service day after day he understands it more and more so, for example, myself when I do Sankirtan I am able to speak with professionals and people and actually carry on a very nice conversation presenting the philosophy according to how they can appreciate whereas younger, a younger man, he can't do that so he relies more on the mechanics. [Transcript, May 7th, 1980 at pp. 65-67].
The Krishnas also assert that some of these "conflicts" are merely misunderstandings, and inevitable occurrences at events like the New York State Fair. First of all, say the Krishnas, the New York State Fair administration has not been very conciliatory towards the Krishnas for the last three years. They claim that the surrounding circumstances of at least one of the 1979 arrests suggest that some fair goers' complaints were aggressively solicited by the State Fair administration.
As further proof of a hostile attitude on the part of the State Fair administration, the Krishnas argue that if the liaison system  created by stipulation between the Krishnas and the State Fair administration had been properly utilized by the administration, most, if not all of the "incidents" could have been easily resolved. Under the liaison system, each side was to designate a representative to whom complaints would preferably be taken before it was forwarded through more formal dispute resolution channels. The Krishnas say that such a liaison system was successfully employed during the Eastern State Exhibition held annually in Springfield, Massachusetts. At the 1979 Exhibition, there were no arrests of Krishnas arising out of their Sankirtan activities, and all fair goer complaints were purportedly resolved through the liaison system. The Krishnas also claim that when a complaint about them arises at any forum, and a member of the public desires a refund, such a request is always honored. Finally, the Krishnas assert that whenever an event draws between 600,000 and 700,000 patrons, there are bound to be a few among them who are going to be less than receptive to individuals propagating unfamiliar religious beliefs.
The Krishnas state flatly that they cannot practice Sankirtan from the confines of a fair booth. They base this conclusion on both religious dogma and considerations of practicality. The Krishnas believe that, by definition, the karmi or non-believer is so caught up in the material world and oblivious to Krishna that the devotee must initiate the process towards spiritual purification:
Well, because of the nature of the conditioned soul is rebellious for Krishna, they don't want to serve Krishna. That is why they are in the material world. It is almost like a bad child but serving Krishna it's actually what he should do. You see, just like a child may not want to take some medicine but he is sick and if he takes the medicine, he will just get better. But if you try to give the child the medicine he will go, "No, No, I don't want that."
So it is the task of the doctor or the mother to give him the medicine because she knows it's best. So we are approaching conditioned souls because they in their own right will not turn to Krishna. [Transcript, May 7th, 1980 at p. 88].
The Krishnas further maintain that, from a practical point of view, the fair goers are unlikely on their own to go out of their way to find a Krishna booth at the State Fair. This being the case, the Krishnas would be denied or restricted in their opportunity to spread the "truth," solicit contributions, and gain converts. In brief, the Krishnas believe that comparatively, the impact of the State Fair booth restriction on them is much more pronounced than its impact on commercial vendors.
The Krishnas commenced this action because, in their view, which has now been supported by numerous decisions of the courts, their right to practice Sankirtan is protected under the First Amendment. See e. g. United States v. Silberman, 464 *157 F.Supp. 866, 872 (M.D.Fla.1979) and cases cited therein. Citing the case of Murdock v. Pennsylvania, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943), they argue that merely because religious literature is sold by "itinerant preachers" rather than donated does not mean that such sales are not protected by the Constitution. To the contrary, plaintiffs assert that the State Fairgrounds are a public forum and therefore their activities may only be reasonably restricted by the State. While they say that the stipulated conditions they agreed to with the State Fair administration are reasonable conditions, the booth restriction is not and is therefore unconstitutional. See, Edwards v. Maryland State Fair, 628 F.2d 282 (4th Cir. 1980); ISKCON v. Bowen, 456 F.Supp. 437, aff'd 600 F.2d 667 (7th Cir. 1979), cert. denied 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979).
Besides, the defendants have not, according to the Krishnas, demonstrated a compelling state interest that would justify the booth rule. Concerns for reducing traffic congestion, the commercial success of other vendors, or the likelihood that fair goers may be put off by the Krishnas, they say, are insignificant when balanced against the fundamental rights of the Krishnas to freedom of speech, religion, and assembly. See ISKCON v. Bowen, supra, at 443. The Krishnas additionally maintain that the booth restriction is not justified by the State's concern to police violations of the penal laws. This policing, they add, is best pursued by prosecutions of criminal law violations, rather than by restraining the free expression rights of many people in order to punish a few individuals. In short, the Krishnas believe that the First Amendment guarantees their right to circulate freely in the public areas of the New York State Fairgrounds for the purpose of proselytizing, soliciting, and accepting donations for their religious organization. They ask this Court to grant them a permanent injunction restraining the defendants from enforcing the booth rules.
Placing plaintiffs' legal arguments aside for one moment, the foregoing, in plaintiffs' view, is an accurate portrayal of their religious beliefs, and their code of conduct, which, they assert, entitles them to a constitutional license to conduct Sankirtan and roving solicitations at the New York State Fair. It should be noted that, for the most part, it is the only portrayal of the Krishnas that has been put before a court of law in the United States. Yet, the eleven days of trial have provided this Court with an opportunity to evaluate testimony that expands upon and contradicts much of what has just been presented as plaintiffs' evidence. This evidence is both highly revealing and relevant to the central issue this Court addresses today. For the integrity of the record, however, it must be said that the testimony remains incomplete. This is due entirely to the actions of plaintiffs, who did not in good faith comply in a timely or complete manner with this Court's Order requiring the production of various documents and things. That order, dated April 16, 1980, mandated that plaintiff produce various materials, including financial records, which would have enabled the Court to verify many of plaintiffs' claims with regard to the manner in which they conducted Sankirtan at the previous New York State Fairs.
To fully understand the Krishna practice of Sankirtan, let us retrace our steps, using the record of this case as our guide. We shall begin by re-examining two themes stressed by plaintiffs, but in a slightly different light: The first is the fact that, by their own admission, a central motivation behind the practice of Sankirtan is the collection of money. As we know, the Krishnas subscribe to the view that the more money they collect, the more spiritual benefit the contributor receives. Money is very important to the Krishnas. They hold money-raising marathons, and Krishna devotees are awarded "lakshmi points" for the amount of money they raise. When Krishna devotees become proficient at practicing Sankirtan and collecting money, they are given collection quotas by their Brahmans or priests, some as high as $100.00 to $200.00 a day. In short, while the collection of money in the Krishna faith has spiritual *158 significance, from a practical perspective, the Krishna devotee is under pressure to collect it for its own sake.
The second theme concerns the Krishnas' view of the karmi or nonbeliever. The karmi were typically referred to by the Krishna devotee witnesses at trial as either being "diseased", "illusioned", "misguided", "dogs", or "children." Although Krishnas claim that Sankirtan is an important religious ritual used to spread the "truth" of Krishna, one of plaintiffs' exhibits states: "[t]he Lord Himself as the Super soul within his heart purifies [the nonbeliever] from his maternal attachments, even if he doesn't fully understand the spiritual significance of his donation." The evidence submitted at trial revealed that this statement has a practical translation  it is not important to the Krishnas that the karmi understand the "meaning" of their contribution, be involved in a religious discussion about Krishna, or, as will be expanded on momentarily, even be able to recognize the religious identity of the devotee. A third theme was also raised by the Krishnas, and that is the devotee should rely on the Lord for success in practicing Sankirtan. The following would indicate that they do not. Let us now re-examine the Krishnas' solicitation methods with the considerable aid of additional trial testimony on the Krishnas' Sankirtan habits.

III.
The Krishnas have a very distinct style of appearance and dress compared to customary western fashions. For instance, Krishna males sport shaven heads except for a thin braided ponytail. On their faces, both males and females wear ceremonial "tilak" paint, which is muddy green in color. For their clothing, the males wear "dhotis" or an Indian style dress-like garment, and the females wear "saris", or the feminine version of the same thing. Both males and females wear "tulsi" beads around their necks and frequently carry burlap pouches or satchels. Usually, Krishna devotees appear this way in public and are commonly seen in the streets in large groups, dancing and chanting, which is the traditional form of Sankirtan. Yet, at the New York State Fair, when the Krishnas performed their modern version of Sankirtan, they literally adopted disguise. The men wore wigs to cover up their heads, and they donned western styled dress. One Krishna stated at trial that because of the disguise, people feel more at ease when solicited. Before addressing this claim, let us take a closer look at how this disguise is employed. To do so, we must first re-examine the method by which Krishnas are trained to practice Sankirtan.
In the first place, solicitation is not required of all devotees. At their farm in Port Royal, Pennsylvania, for example, only a very few devotees ever engage in Sankirtan. The same is true of the urban temples. In New York City, the Krishna temple has between 600 and 1000 members, 190 of whom live at the temple. Solicitors are taken only from among those who live at the temple, and of that group, only 25 or so participate. To learn how to solicit, devotees are given classroom and on-the-job training. The instructions and the manner in which they are carried out are the same from temple to temple. The classes seem to serve the purpose of "psyching" devotees up for their solicitation duties. They are encouraged to be aggressive when soliciting and to try to get as much money from the karmi as possible. Moreover, they are told that the best way to please their spiritual master is by doing such duties well. This statement holds special significance to the Krishnas because spiritual masters hold great power over devotees. If a devotee is told by a spiritual master that a snake is a stick and to pick it up, then the devotee is to comply. Creativity in soliciting is also encouraged. Devotees are told to figure out ways to get the karmi to donate more money. For example, at Christmas time, the most common Krishna ploy is to dress up as Santa Claus and give out candy canes while soliciting contributions.
More specific instructions are given during the on-the-job training. New devotees are usually sent out with senior devotees *159 who the Brahmans or priests consider to be experienced at Krishna methods of solicitation. The new devotees are told to follow the directions of their instructor. For example, one ex-devotee from the Baltimore temple was sent out by her Sankirtan leader with two of the best female solicitors of the temple. She was instructed not to wear an identification badge and, if possible, to avoid verbally affiliating herself with the Krishnas to potential donors. If someone were to ask her affiliation, she was taught to try to confuse that person by slurring the word "Krishna" into sounding like the word "Christian." She was also instructed to make up "purposes" for requesting donations. For example, she was told to say that she was soliciting for worldwide education and food distribution programs or children's drug programs. She was further told that it was all right not to ask people's permission before pinning a button or artificial flower on them. As for the religious records which were used for solicitation purposes, potential donors were informed that the musical stars mentioned on the back of the albums actually performed on the albums. According to her testimony, the devotees would only rarely discuss religion with a prospective contributor. Religious discussions were considered a nuisance to the devotees, especially when they solicited at places with a lot of people, because such conversations would cut down on the amount of soliciting that could be done.
Other techniques for increasing monetary contributions included: flirting with males, attempting to get people to donate larger bills, intentionally miscounting change, folding over bills to shortchange people, and holding large bills for a long time in an effort to make the donor tired of the idea of getting the desired amount of change back. The junior devotee was told that it was all right to lie to security personnel in order to obtain the right to solicit at an airport, and to enter private premises to solicit without permission. She was taught to target people such as navy men as easy marks. Once her instructor took her to a nearby naval base on its monthly pay day. Apparently, the Krishna instructor's secret ambition was to get a serviceman to "donate" his entire monthly pay check to the Krishnas. Asked by defendants' counsel whether these incidents were isolated events, perpetrated by overzealous devotees, the ex-devotee responded: "It was their normal enthusiasm, they had done it for a long time."
Indeed, the Court learned that these incidents were not isolated, and they were not the acts of a small handful of "immature" or "inexperienced" devotees. In fact, almost without exception, the testimony of this ex-devotee should be looked upon as an index of the different soliciting methods habitually employed by the Krishnas. As proof of this, we will examine the complaints of fair goers and other local citizens concerning the solicitation habits of the Krishnas in the past three New York State Fairs and in the Syracuse area as a whole. Before doing so, however, let us first take a closer look at just how experienced many of the Krishnas are at soliciting, and the attitude of some of the Brahmans, or priests, of the religion towards those devotees who conduct Sankirtan.
As previously mentioned, one Krishna priest testified at trial that complaints about the Krishnas' solicitation methods are due primarily to the actions of inexperienced devotees, hostile fair officials or fair goers. In addition, the Krishnas claim that if complaints are received by them about a devotee's solicitation methods, that devotee is removed from the Sankirtan party. These statements are absolutely untrue. For instance, the Krishna priest who made the statement, Christopher Kelly, is not only a priest of the Krishnas, he has performed Sankirtan for over six years, and even gives instruction on its practice to "spiritually advanced" devotees. Mr. Kelly was arrested at the 1979 New York State Fair. Despite his "qualifications," the arrest allegedly grew out of a soliciting incident involving a 14 year-old boy. The boy's statement is quoted in part below:
This guy came up to me, who was later identified to me as being Chris Kelley, and he stuffed an album, record album, *160 under my arm. He told me he was giving me the album and then he asked me for a small donation so I gave him some change, it was either 30 or 35 cents. He said, "Give me a bill and I'll give you some change." So I pulled a dollar bill and he said, "No give me a twenty." He saw the twenty dollar bill that I pulled out of my pocket. I thought he was going to give me nineteen dollars back and he only gave me back ten dollars. I gave him the album back and told him that I wanted my money back. I gave him the album and he said, "Don't push that at me." I told him I wanted my money back again and he gave me back the twenty and then I told him I wanted the one dollar back too and he gave it back to me. They left and I went to get my clothes out of my car and went back and reported it to the trooper.
Although he has been arrested and convicted many times for illegal solicitation, another Krishna devotee who is still involved in soliciting is Raymond Kissane. His solicitation technique would indicate that he is anything but the portrait of the culturally shocked, hapless, and unconfident devotee whose actions, according to the Brahman quoted earlier in this opinion, may result in solicitation complaints. Mr. Kissane has at least six arrests and convictions involving illegal solicitations dating back to 1976. He was arrested and convicted at the New York State Fair in 1977 for disorderly conduct after a 15 minute spree in which he jumped in front of as many people as he could on a pedestrian ramp, grabbing people by the arm as they went along. More recently, Mr. Kissane was arrested at the 1979 North Carolina State Fair and was charged with three counts of false pretenses, when he allegedly misrepresented the content of records and shortchanged fair goers. He pleaded no contest to a reduced charge of larceny by trick.
Still another Krishna devotee, James Griffith, was arrested three times at the New York State Fair in 1979. Needless to say, he was not removed by the Krishnas from soliciting after his first arrest. One incident allegedly grew out of a combined "money-holding" and shortchange scam. Two others involved placing records under people's arms as they were walking, in order to get their attention. There were other multiple arrests of Krishnas as well. Richard Banbury, a Krishna devotee, was arrested at the 1978 State Fair for harassment; the charge was subsequently reduced, and adjourned in contemplation of dismissal. He visited the State Fair once again in 1979 and was arrested and convicted for disorderly conduct.
These are only a sampling of Krishna arrests and convictions growing out of their solicitation activities which directly or indirectly relate to the Krishna claim that they use honest solicitation techniques at the New York State Fairs. None of the facts underlying these incidents reflect the inexperience of the Krishna devotees at soliciting or the hostility of fair officials or fair goers. Quite the contrary, these individuals are experienced at what they do, and the Krishnas deliberately permit them to continue performing illegal solicitation techniques, even though such techniques frequently lead to the arrest and conviction of Krishna devotees. It would seem that so long as the Krishnas financially benefit from such techniques, one can expect there will be similar arrests and convictions in the future.
A Krishna Brahman is quoted above as saying that "in this day and age, example is more important than precept. The particulars are that you must behave according to the philosophy that you are trying to preach ...." Consider this statement along with the following and final example of the fact that the Krishnas continue to financially benefit from the services of individuals who they know employ overly aggressive solicitation techniques, but who are not removed from Sankirtan duties. At one point during the trial, counsel for plaintiffs asked the ex-Baltimore devotee, whose escapades are described above, whether her two women instructors could properly be characterized as "crooks." She answered in the affirmative. Subsequently, a Brahman supervisor, Steven McLain, who oversaw the activities *161 of these women instructors, was asked by defendants' counsel whether he considered the woman known as the more aggressive of the two to be a crook. He responded in the negative. In fact, even though Mr. McLain had learned of numerous complaints arising out of the aggressive solicitation habits of this particular individual, he assigned her to teach fledgling Krishnas, such as the ex-Baltimore devotee, how to do the same. The Court now turns to a more detailed analysis of how the Krishna solicitation techniques were employed at previous New York State Fairs, and in and around the Syracuse community as a whole at the time of the State Fairs.
As the Court learned from the trial testimony, a common practice of the Krishnas is to "target" their prospective donors. The Krishnas do not rely merely on indiscriminate solicitation. They pick on certain types of people, or people in certain situations, when they solicit. One such group is teenagers, especially those who appear unsophisticated. A complaint involving a teenager has already been described, and it is one of several complaints involving teenagers. Another group that is "targeted" is couples with young children. The Krishnas discovered that these couples are easy marks because they cannot afford to divert their attention for very long from watching the children. Thus, the persistent Krishna solicitor can be relatively assured of a contribution, just so he will go away and let the couple go about their business.
Sadly, still another group that is "targeted" is the handicapped. At least two incidents at past New York State Fairs resulted when Krishna devotees approached groups of retarded adults and pinned flowers on them while, at the same time, asking for contributions. Many of these adults clearly were startled because they did not understand what the Krishnas were doing. Obviously the Krishnas knew they would not and sought to use this fact to their advantage. Individuals who appear to be mentally slow or very unsophisticated are also "targets." On September 1, 1978, which was during the week of the 1978 State Fair, one such individual was approached in downtown Syracuse by a female Krishna devotee, who almost succeeded in obtaining a "contribution" of $80.00 through the use of the "wad of bills" technique which is explained below. The entire incident was observed by a plainclothes police officer who forced the devotee to return the money. The same female devotee then went across the street, and was involved in another soliciting incident with a young boy when she allegedly would not return his $10.00. Had the officer not intervened in both cases, the Krishna devotee would have succeeded, as the next example of "targeting" demonstrates.
In a related incident which occurred the same day and in the same vicinity, a twenty-four year old girl afflicted with cerebral palsy was waiting for a bus to take her home from work. She was approached by a female devotee who pinned an artificial flower on her without her permission, and asked for a donation for "starving children." When the young woman reached in her purse for her wallet to make a $1.00 donation, the devotee stood on her tiptoes and observed that the wallet contained some larger bills totaling $20.00. The devotee asked the young woman to exchange the larger bills for all of the dollar bills that she was holding. The young woman agreed to do so and expected $19.00 in change. She was not to receive it. The Krishna devotee handed her a copy of the Bhagavad-Gita and "took off" without giving her the change.
It has already been described how at the New York State Fair the Krishnas conceal their religious identity from people by wearing western dress. There were many incidents of the Krishnas' attempt to further cloud their identity by hiding their identification badges, which read "ISKCON", not the religion's popularly known name "Hare Krishna", from being clearly visible, or not wearing them at all. This tactic was revealed by the ex-Baltimore devotee as being purposeful. Another device used by the Krishnas is to carry someone else's identification card. By not properly displaying their identification badges the *162 Krishnas not only concealed their identity, but they were in violation of a Court order requiring them to do so.
For the past three years the devotees at the New York State Fair have routinely misrepresented their Krishna affiliation as well. This is accomplished in two different ways. First, by misrepresenting the organization that they solicit for, and second by misrepresenting the items that they sell. The most frequently used lines at past State Fairs represented to the fair goer that the devotee was either soliciting for the benefit of crippled children's hospitals, drug addicts, or retarded children. These are not true statements even if broadly construed. If a religious book or record was sold, Brahman testimony at the trial indicated that the money was used to produce another book or record. The remainder of the contributions are used to support the various temples or farms. For example, at the 1978 State Fair, contribution money was used to bail out arrested Krishnas from jail. Aside from the admissions made during trial, which the Court believes is dispositive of this issue, the Krishnas refused to comply with this Court's Order compelling them to turn in to the Court their financial records which would conclusively prove the matter one way or another. Some information was handed over, however, it was subsequently conceded by plaintiff's treasurer Scott Ellis to be inaccurate. Therefore, the Court must assume that accurate proof of plaintiffs' claims of soliciting on behalf of charity does not exist.
Krishnas have also fabricated stories portraying themselves as representatives of contests giving away records to the 50 best-looking couples, or as radio station employees willing to give lucky fair goers a record if they named the correct radio station. Needless to say, the Krishnas did not care which station the fair goer named. This assumption was borne out when one plain-clothes police officer named a television station from a distant city and was told by the devotee that it was the correct answer. Without exception, after a fair goer "won" the record by naming some type of station, the Krishna devotee, still without identifying their true identity, asked for a contribution. As noted above, the use of such stories was also employed at the Baltimore temple, and the Krishnas used similar stories at the Erie County Fair and the Eastern States Exposition.
The Krishnas also misrepresented their affiliation by the various items they sold for a contribution. Artificial flowers and "Keep On Truckin" buttons have no religious significance, but of course they were selected as such because they did not. The items were used strictly because they could be rapidly sold without any questions  especially questions about the Krishna religion. The most commonly used items were the religious records. It is difficult to tell they are religious albums just by looking at them. They are packaged to look like the records of popular recording artists, and the word ISKCON only appears in small lettering on the back. The records are first pitched to the fair goer and if they show no interest, the Krishna devotee then turns the record over to show that it contains performances of the Beatles or Stevie Wonder. One woman was startled to discover that her Stevie Wonder album sounded like a "cat in heat," and she could not figure out why Stevie Wonder would want to ruin his career like that. What she had actually heard was a typical Krishna song. The same kind of record scam was used in Baltimore, the Erie County Fair, and the Eastern States Exhibitions. Even though the Krishnas have received many complaints about the representations they make with respect to these records, they continue to use them and have yet to alter the misleading packaging. The Court cannot help but conclude that the Krishnas are only interested in taking money from people and care very little about the means they use to get it.
It is not unusual for those means to be more forceful. Sometimes a victim's money is taken outright and the devotee disappears in the crowds. At the State Fairs, devotees also used various short-change tricks such as those described by the ex-Baltimore devotee. For instance, dollar bills *163 were folded over to look like more bills were underneath; devotees would intentionally hold money and pretend to be making change while hoping to distract the fair goers with conversation so that they would forget how much change they asked for; devotees would ask for larger bills because they were constantly able to pressure a person into giving more money if they could get a larger bill to make change from. The "wad of bills" scam was also employed, whereby a Krishna would ask to exchange their singles for bills with larger denominations. Once they got the bill in their hand, they would either not give the correct change or they would "take off" into the crowd. Without exception, fair goers were pinned with an artificial flower or candy without their permission. One woman complained that after she declined to give a contribution for the flower pinned on her blouse, the devotee tore the flower off her and called her a demon. A similar incident happened with another fair goer. This individual was approached by a Krishna devotee and correctly named a radio station and won a record as a "prize". He was then asked to make a contribution which he refused to do because, as he understood it, the record was free. The devotee then tried to grab the record out of his hands. When he failed to do so, he followed the fair goer and cursed him as he walked. As mentioned above, there were numerous other arrests of devotees at the 1977, 1978, and 1979 State Fairs. Some of these arrests have lead to convictions, some of the defendants skipped bail, and the remaining charges are still pending.
One of the only things that the Krishnas did not do at the State Fairs was to discuss their religion with fair goers. Despite the Krishna claims that Sankirtan is the means by which they spread the "truth" of Krishna and gain converts, they did not appear to engage in any sort of religious discussion with the fair goers. At trial, each witness who was approached by the Krishnas and asked for money confirmed that the Krishnas made no mention of their religion at all. Some witnesses claimed they were given some sort of magazine by the devotees but they did not know what the magazine was about. This lack of knowledge can only be attributed to the fact that the Krishnas never explained their religious paraphernalia to the fair goers and rarely identified or explained their affiliation.
It should also be noted that Krishna devotees were found to have flagrantly violated the terms of the stipulated conditions made part of the Court's Orders granting the plaintiffs preliminary injunctions for the 1978 and 1979 State Fairs. Problems with identification badges were already mentioned. Other violations included failing to: register devotee identities, engage in solicitation in a peaceable manner and without harassment to the public, ask fair goers' permission before touching them, honor the requirement that they not solicit within 10 feet from an exhibition or booth, or solicit fair goers sitting on a bench or waiting in a ticket line. Other violations of Court Orders included entering the fair grounds for solicitation purposes during a period when Krishnas were ordered not to do so and trying to enter the fair grounds without paying the price of admission. Similar problems were also experienced with violation of the stipulated agreement at the Eastern States Exhibition.

IV.
Plaintiffs bring this action under 42 U.S.C. § 1983, claiming that their First Amendment rights will be violated if their Sankirtan activities are confined to a booth. Before the Court addresses these alleged violations of plaintiffs' constitutional rights, it must first consider whether the alleged actions of defendants amount to "state action", which is the jurisdictional prerequisite of Section 1983. In Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), the Supreme Court held that for state action to exist there must be a "sufficiently close nexus between the State and the challenged action of the [defendant] so that the action of the latter may be fairly treated as that of the State itself." See, Burton v. Wilmington Parking Authority, 365 U.S. 715, *164 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Graseck v. Manceri, 582 F.2d 203, 207-09 (2d Cir. 1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 91. In the present case, neither party disputes the fact that as administrators of the New York State Fair, and responsible for the regulations in dispute, the actions of defendants demonstrate a sufficiently close nexus with the State of New York. The Division of the State Fair and the New York Industrial Exhibit Authority are both state agencies that exist at the pleasure of the State Legislature for purposes of operating the State Fair. The State provides these agencies and the Fair with its operating budget, fair grounds and buildings, and State Police patrols. In sum, the actions of these defendants in enacting and enforcing the booth rules are "state action" and therefore the Court may properly exercise jurisdiction over plaintiffs' constitutional claims which will now be addressed.
The right of a citizen to form, hold, and express opinions and beliefs in a public forum is so essential to our democracy that it is considered to be "fundamental." Schneider v. State, 308 U.S. 147, 161, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939). This proposition is reflected in the fact that "[w]herever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 963, 83 L.Ed. 1423 (1939); Kunz v. New York, 340 U.S. 290, 293, 71 S.Ct. 312, 314, 95 L.Ed. 280 (1951). At the same time, these First Amendment rights are not absolute. Murdock v. Pennsylvania, 319 U.S. 105, 110, 63 S.Ct. 870, 873, 87 L.Ed. 1292 (1943); Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1946). While the government has no power to regulate communication or belief because of its content, Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972); Police Dep't of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972); Cohen v. California, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971); Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969); New York Times v. Sullivan, 376 U.S. 254, 269-270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964); Niemotko v. Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951); Cantwell v. Connecticut, 310 U.S. 296, 305, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940), it may restrict the exercise of First Amendment rights if justified by compelling public interests. Grayned v. City of Rockford, 408 U.S. 104, 115-16, 92 S.Ct. 2294, 2302-03, 33 L.Ed.2d 222 (1972); Police Dep't v. Mosley, 408 U.S. 92, 98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972); Adderly v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 536, 554-55, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).
Still, even when regulations are justified because of a compelling public interest, the regulations must be written as to reasonably restrict the time, place and manner of the right involved. As held by the Court in Virginia Pharmacy Board v. Virginia Consumer Council, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976): "[w]e have often approved restrictions [on time, place and manner] provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample channels for communication of the information." See, Grayned v. City of Rockford, 408 U.S. 104, 115-16, 92 S.Ct. 2294, 2302-03, 33 L.Ed.2d 222 (1972); Jamison v. Texas, 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); Martin v. Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Cox v. New Hampshire, 312 U.S. 569, 574-77, 61 S.Ct. 762, 765-66, 85 L.Ed. 1049 (1941); Cantwell v. Connecticut, 310 U.S. 296, 304, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940); Schneider v. State, 308 U.S. 147, 160-61, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939); Concerned Jewish Youth v. McGuine, 621 F.2d 471 (2d Cir. 1980); Tribe, American Constitutional Law *165 687 (1979). The balancing process which must be applied in these situations has been stated as follows:
Although American constitutional jurisprudence, in the light of the First Amendment, has been jealous to preserve access to public places for purposes of free speech, the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question.
Lehman v. City of Shaker Heights, 418 U.S. 302-03, 94 S.Ct. 2714, 2716-17, 41 L.Ed.2d 770 (1974); Hague v. CIO, 307 U.S. 496, 515-516, 59 S.Ct. 954, 963-964, 83 L.Ed. 1423 (1939).
There are other limitations on the type of regulation that may be utilized. For example, where discretion is vested in administrative officials it must be appropriate, and placed under specific guidelines so as not to be unbridled. Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); Cox v. Louisiana, 379 U.S. 536, 555-558, 85 S.Ct. 453, 464-466, 13 L.Ed.2d 487 (1965); Staub v. City of Baxley, 355 U.S. 313, 321-325, 78 S.Ct. 277, 281-284, 2 L.Ed.2d 302 (1958); Saia v. New York, 334 U.S. 558, 560-62, 68 S.Ct. 1148, 1149-50, 92 L.Ed. 1574 (1948). Even when regulations are authorized by explicit and narrow legislative authority, they must be "narrowly tailored to further the State's legitimate interest," Grayned v. Rockford, supra, 408 U.S. at 116-17, 92 S.Ct. at 2294, 2303, 33 L.Ed.2d 22; Police Dept. v. Mosley, supra, 408 U.S. at 98, 92 S.Ct. at 2291; Cox v. New Hampshire, 312 U.S. 569, 575-76, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941), and great weight must be given to the fact that communication is involved. Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); Schneider v. State, supra. The State, moreover, bears the burden of justifying restrictions, Cohen v. California, 403 U.S. 15, 20, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284 (1971). And finally, any regulation which takes the form of a prior restraint is subject to exacting scrutiny. Southeastern Promotions Ltd. v. Conrad, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975); Organizations for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971). In brief, First Amendment rights "must not, in the guise of regulation, be abridged or denied." Grayned v. City of Rockford, 408 U.S. 104, 117, 92 S.Ct. 2294, 2303, 33 L.Ed. 222 (1972).
Unlike many other regulations challenged by the Krishnas, the regulation at issue in the present case does not, in any fashion, restrict the Krishnas' right to discuss their religion with anyone or distribute religious paraphernalia on any part of the fair grounds at any time. Compare Edwards v. Maryland, 628 F.2d 282 (4th Cir. 1980) (solicitation and distribution of literature confined to a booth); ISKCON v. Bowen, 456 F.Supp. 437 (S.D.Ind.1978) aff'd 600 F.2d 667 (7th Cir. 1979) cert. denied 444 U.S. 643, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979) (solicitation and distribution of literature confined to a booth). Furthermore, the regulation at issue here does not limit the number of persons that may solicit on the fair grounds at any one time. Compare ISKCON v. McAvey, 450 F.Supp. 1265 (S.D.N. Y.1978) (limits solicitors at World Trade Center to ten). The regulation makes no relevant distinction on the basis of the content, nor does it grant an official unbridled discretion to deny Krishnas the right to solicit. Compare ISKCON v. Kearnes, 454 F.Supp. 116 (E.D.Cal.1978) (permits issued to those who "probably will not" engage in fraud.) And it is not challenged as being vague or overbroad on its face. Compare, ISKCON v. Eaves, 601 F.2d 809 (5th Cir. 1979).
Instead, the present regulation merely requires that "all solicitation for either contributions or sale must be made from within the confines of a booth or display." It should be noted that there is also a license requirement mandating that a fee be paid for the exhibit space. This fee requirement was not made an issue during the trial of this action by plaintiffs and the Court does not address it today. Plaintiffs did not offer proof on the extent of the fee, and thus the Court is without any evidence to conclude whether the booth fee is a "nominal *166 fee imposed as a regulatory measure to defray the expenses of policing the activities in question," Murdock v. Pennsylvania, 319 U.S. 105, 113-14, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943), or whether it is a "flat license tax the payment of which is a condition of the exercise of ... constitutional privileges." Id. at 112, 63 S.Ct. at 874.
With these preliminary matters out of the way, the Court can narrow the issues that need to be addressed. The present case does not involve questions of prior restraint due to license fees or the inability of plaintiffs to move about and distribute literature, or engage in religious discussions. Neither does this case deal with the issue of whether a regulation discriminates in treatment because of the content of the speech. Defendants have made no attempt to ban plaintiffs from the fair due to a judgment on defendants' part concerning the nature of plaintiffs' religious beliefs. There is also no claim by plaintiffs that the booth restriction grants administrative officials unbridled discretion in granting or denying plaintiffs a booth. Even though a "public welfare" standard for booth content is to be found in the disputed regulation, plaintiffs have not challenged this provision and it is not applicable here. In addition, plaintiffs do not claim that defendants' regulation is void for vagueness. It would seem that plaintiffs' claims that the booth restriction violates their rights to freedom of speech, religion, and assembly commonly evolve from the constitutional doctrine of overbreadth, as applied. See generally, Grayned v. City of Rockford, 408 U.S. 104, 114-15, 92 S.Ct. 2294, 2302, 33 L.Ed. 222 (1972). In other words, it is plaintiffs' claim that the booth restriction is not a reasonable time, place, and manner regulation. The thrust of plaintiffs' claim is that there is a less restrictive means by which defendants can regulate plaintiffs' First Amendment rights and still accommodate the State's legitimate regulatory interests. Before addressing this argument, the Court will first examine whether the State Fairgrounds is a "public forum" or an arena traditionally associated with the exchange of views among the public and thus increasing the burden on the State to justify the extent of its regulatory scheme. See generally, Tribe, American Constitutional Law 690 (1979); Stone, "Fora Americana: Speech in Public Places," Sup.Ct.Rev. 233 (1974).
Where places of social commerce are generally reserved or associated with the exercise of First Amendment rights, then it is incumbent on the state to demonstrate a compelling interest in its regulatory scheme, which must, as a consequence, be drawn with narrow time, place, and manner regulations. See Wright v. Chief of Transit Police, 558 F.2d 67, 68 (2d Cir. 1977) (subway station held to be public forum); Wolin v. Port of New York Authority, 392 F.2d 83, 92-93 (2d Cir. 1968) (bus terminal held to be public forum). Defendants assert that the State Fairgrounds is not a public forum. According to them, the state fair is a "non-traditional" forum, whose chief purpose is as a place to house agricultural and industrial exhibitions, and to support educational and competitive junior activities. The Fairgrounds, maintain defendants, cannot be equated on a constitutional basis with a park or a street corner "immemorially ... held in trust for the use of the public, and, time out of mind, ... used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 495, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). The Court cannot agree. In the words of Judge Higginbotham, "[a] fair is almost by definition a congeries of hawkers, vendors of wares and services, purveyors of ideas, commercial, esthetic and intellectual." ISKCON v. State Fair of Texas, 461 F.Supp. 719 (N.D.Tex.1978). It would be unreasonable to hold that the New York State Fair could accurately be described as substantially different in purpose or effect. Still, merely because the State Fair is a public forum does not mean that it is excepted from the reasonable regulations of time, place and manner. Lehman v. City of Shaker Heights, 418 U.S. 298, 317, 94 S.Ct. 2714, 2724, 41 L.Ed.2d 770 (1974); Wright v. Chief of Transit Police, 558 F.2d at 68; *167 Wolin v. Port Authority, 392 F.2d at 89. This issue shall now be discussed.
Plaintiffs assert that the booth restriction is an unreasonable method by which to regulate the Krishnas' solicitation activities. They claim that the government interests raised by defendants, such as to prevent traffic congestion, insure public safety and to protect the public from fraud, do not justify their confinement to a booth. In plaintiffs' view, defendants have not offered any serious evidence of disruption in traffic as a result of plaintiffs' Sankirtan activities. With regard to fraudulent behavior, plaintiffs assert that any fraud perpetrated by devotees are isolated instances, and may be adequately dealt with by criminal prosecutions. Plaintiffs additionally point out that agreements with other fair administrations have been less restrictive than the booth requirements of defendants and have permitted Krishnas to practice Sankirtan. Finally, where liaison systems have been employed in good faith, plaintiffs assert that complaints have been resolved, and the need for arrests has been eliminated.
In contrast, defendants contend that the New York State Fair booth rule is a reasonable time, place, and manner regulation which is justified by compelling government interests. Defendants place the foundation of their argument on the State's interest in preventing fraud. They point to their previous experience with the Krishnas as proof positive of the necessity of the booth rule to combat plaintiffs' fraudulent activities. The Krishnas' solicitation activities, say defendants, also demonstrate the need for a booth rule to control pedestrian traffic. Defendants argue that the booth rule is additionally necessary to protect the rights of exhibitors and fair goers to communicate with each other, and the rights of the fair goers to choose or decline access for communication, and assures the equal treatment of political and religious organizations.
The issue in this case is a narrow one. That is, whether it is constitutionally permissible for a State Fair to require that solicitation of money for religious purposes be restricted to a booth. While plaintiffs claim that their rights to freedom of speech, religion and assembly would be violated if their Sankirtan activities are restricted to a booth, they do not dispute that even these activities are subject to reasonable time, place, and manner regulations. This rule was succinctly stated as follows:
The general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose. Such regulation would not constitute a prohibited previous restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise.
Cantwell v. Connecticut, 310 U.S. 296, 305, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940). Although the Krishnas claim that their very act of soliciting is a religious belief, the test just enumerated is applicable nonetheless. Furthermore, the Supreme Court has held "that when `speech' and `nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968) (burning draft card found to be unprotected speech); accord Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978); see also Sherbert v. Verner, 374 U.S. 398, 403, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963) (challenge to unemployment compensation act by Seventh Day Adventist where law required that individual remain available to work Saturdays). The Court will assume for purposes of this analysis that the very act of exchanging money does carry with it some religious significance for the Krishnas. However, even the Krishnas concede that the monies collected in Sankirtan are also significant to them for its purely commercial value to support the religion. [Plaintiffs' trial brief, Appendix A *168 ¶ B]. To the extent that they do, the Court is hard pressed to distinguish between the solicitation activities of Sankirtan and purely commercial speech which the Supreme Court has said deserves the least constitutional protection. In Va. Pharmacy Bd. v. Va. Consumer Council, 425 U.S. 748, 771-72, 96 S.Ct. 1817, 1830-31, 48 L.Ed.2d 346 (1976), the Court held:
Untruthful speech, commercial or otherwise, has never been protected for its own sake. Gertz v. Robert Welch, Inc., 418 U.S. 323, 340 [94 S.Ct. 2997, 3007, 41 L.Ed.2d 789] (1974); Konigsberg v. State Bar, 366 U.S. 36, 49, and n. 10 [81 S.Ct. 997, 1006, 6 L.Ed.2d 105] (1961). Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely.
The Court continued its statement in an accompanying footnote which is worth quoting at length:
24 In concluding that commercial speech enjoys First Amendment protection, we have not held that it is wholly undifferentiable from other forms. There are commonsense differences between speech that does "no more than propose a commercial transaction," Pittsburgh Press Co. v. Human Relations Comm'n, 413 U.S. [376], at 385 [93 S.Ct. 2553, 2559, 37 L.Ed.2d 669], and other varieties. Even if the differences do not justify the conclusion that commercial speech is valueless, and thus subject to complete suppression by the State, they nonetheless suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired. The truth of commercial speech, for example, may be more easily verifiable by its disseminator than, let us say, news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else. Also, commercial speech may be more durable than other kinds. Since advertising is the sine qua non of commercial profits, there is little likelihood of its being chilled by proper regulation and foregone entirely.
Attributes such as these, the greater objectivity and hardiness of commercial speech, may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker. [Emphasis Added]. Compare New York Times Co. v. Sullivan, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964), with Dun & Bradstreet, Inc. v. Grove, 404 U.S. 898 [92 S.Ct. 204, 30 L.Ed.2d 175] (1971). They may also make it appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive. Compare Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241 [94 S.Ct. 2831, 41 L.Ed.2d 730] (1974), with Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied sub nom. Tobacco Institute, Inc. v. FCC, 396 U.S. 842 [90 S.Ct. 50, 24 L.Ed.2d 93] (1969). Cf. United States v. 95 Barrels of Vinegar, 265 U.S. 438, 443 [44 S.Ct. 529, 531, 68 L.Ed. 1094] (1924) ("It is not difficult to choose statements, designs and devices which will not deceive").
Accord, Friedman v. Rodges, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979). See Emerson, The System of Freedom of Expression, 21-26 (1970). Still, plaintiffs cite the case of Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943), overruling Jones v. Opelika, 316 U.S. 584, 62 S.Ct. 1231, 86 L.Ed. 1691 (1942) (license fee for selling religious paraphernalia found constitutional because it was pure commercial activity), for its statement that:
But the mere fact that the religious literature is `sold' by itinerant preachers rather than `donated' does not transform evangelism into a commercial enterprise. If it did, then the passing of the collection *169 plate in church would make the church service a commercial project. The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books.
What plaintiffs fail to point out is that the Murdock Court qualified its statement on 319 U.S. p. 116, 63 S.Ct. 876. The Court said "the present ordinance is not directed to the problems with which the police power of the state is free to deal .... They are pursuing their solicitations peacefully and quietly." * * * "Nor do we have here, as we did in Cox v. New Hampshire, supra, and Chaplinsky v. New Hampshire, supra, state regulation of the streets to protect and insure the safety, comfort, or the convenience of the public." See Tribe, American Constitutional Law, 724-25 n. 10 (1979) (Murdock tax fell unevenly on poor) citing Emerson, The System of Freedom of Expression 421 (1970). In this sense, then, Virginia Board of Pharmacy stands for the same proposition as Murdock. The state has a compelling interest in regulating speech, of whatever type, which is fraudulent in nature. Accord Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1940); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Edwards v. Maryland, 628 F.2d 282 (1980) reversing 476 F.Supp. 153 (D.Md.1979); ISKCON v. Bowen, 600 F.2d 667 (7th Cir. 1979).
The interest of the government in exercising its traditional police power function for the public health, safety and welfare is beyond question. Pursuant to this power, state administrators, such as defendants, may enact reasonable regulations which serve these ends. In this regard, the booth restrictions at the New York State Fair are a legitimate and compelling administrative aid for the protection of the citizens and society as a whole. One need not look any further than the facts of this case to demonstrate that these restrictions are justified, and are reasonable time, place, and manner regulations which employ the least restrictive means by which the State may regulate First Amendment rights.
The State Fair booth regulation is a reasonable means to combat widespread fraud that cannot be effectively checked by the criminal justice system. There is no question from the record in this case that the Krishnas are engaged in a widespread and systematic scheme of accosting, deceit, misrepresentation, and fraud on the public in their Sankirtan activities. The record shows patterns of deceptive practices identical in nature and practiced throughout New York State, Massachusetts, and Maryland. Other cases involving the Krishnas have reported similar findings, though these courts did not delve into such incidents to the extent that was done in this case. See Edward v. Maryland, 282 F.2d 282 at p. 285 n. 2 (1980); ISKCON v. St. Fair of Tex., 461 F.Supp. 719, 723-24 (N.D. Tex.1978). Plaintiffs have made little, if any, attempt to control its members or to bring these incidents to a halt. Quite the contrary, the Krishnas have condoned such practices by using experienced "thieves" to teach its newer members how to solicit money from the public in exactly the same way. Instead of removing individuals who are known to the Krishna Society as being repeat offenders or overly agressive, the Krishnas have continued to accept the "fruits" of such solicitation methods for its own commercial gain, all under the "cloak" of being a religion.
There are two reasons why this practice continues today, and the first has been discussed immediately above. The second reason is that the regulatory methods employed in the past by various government officials and courts have facilitated the Krishnas in perpetuating their illicit acts. Both government regulations and court orders restricting their conduct have been flagrantly violated. See e. g., Edwards v. Maryland, supra. In fact, the very regulations that plaintiffs urge this Court to recognize today as being less restrictive alternatives to the booth rule are the same regulations that plaintiffs have stipulated to *170 with various defendants around the country and, from all indications, have violated with unabashed arrogance. The liaison system proposed by plaintiffs as a less restrictive alternative is a sham. This Court finds little use in so-called "informal" dispute resolution methods which merely serve as a means to keep criminal recidivists from receiving the full measure of criminal justice. Such a device is not what should rightfully be considered a useful "social tool." As proof of this fact, defendants' Exhibit CR is a compilation of the complaints received by the West Springfield, Massachusetts Police Department, which took complaints for the 1979 Eastern States Exhibition. As a random sample, consider the first five complaints. The first complaint concerns a fair goer who, after receiving a record, was not given back the change he asked for by the Krishna devotee. The second complaint involved two fair goers who were approached by a devotee and each handed a record and told that they were lucky winners for the day. They were then asked for contributions for the records they had "won." The fair goer offered him a dollar. The Krishna devotee took five dollars from the fair goer, took the other fair goer's record back, and said "thank you." The third complaint concerns one of the witnesses in the instant case, Kenneth Solomon, who was wearing incorrect identification when spotted by a police officer when he was standing in an area of the fair grounds which was off-limits to him under the stipulated agreement between the Exhibition and the Krishnas and was engaged in a conversation with another devotee. The second Krishna was also using the wrong type of identification in violation of the stipulated conditions. The fifth complaint was by a Krishna devotee who claims that he handed a fair goer a record and told him that it was not available in stores, but was for a benefit of the Krishna Society which was helping people with farming and education. At that point, the fair goer must have turned to walk away with the Krishna record in tow. The nature of the Krishna devotee's complaint was that the fair goer took the album without giving the Krishna a donation.
The first four examples are not isolated instances of accosting or misrepresentation, nor are they "speculative;" they are systematic, symptomatic and patternistic. While the penal law has been traditionally referred to by the courts as a means by which such incidents can be resolved to the best interests of the society as a whole, see e. g., Schneider v. State, 308 U.S. 164-65, 60 S.Ct. 152 (1970); Edwards v. State of Maryland, supra, at p. 286; ISKCON v. Bowen, supra, at 669; ISKCON v. Kearnes, 454 F.Supp. 116, 121 (E.D.Cal.1978), this Court agrees with that Portion of ISKCON v. Griffin, 437 F.Supp. 666, 673 (W.D.Pa.1977) wherein the court stated that if applied blindly such a position would "ignore the realities of human behavior." Fair goers come to the State Fair from across the State and the United States to enjoy themselves, and not to file criminal complaints, or to return some months in the future to appear as witnesses. Moreover, the Fairgrounds is a difficult area to police in general, due to its size and numbers of people, and disguised Krishnas without identification badges are hard to identify. Even where the criminal laws are invoked, the result is of little deterrent value. Some Krishna defendants jump bail, as is frequently the case, or are simply transferred by the Society to another state. Still other devotees just return to the fair the following year to be arrested once again, utilizing the same aggressive or deceitful techniques, and with the same materials. In perpetuating the problems with our "solutions" we have rekindled the meaning of the words of Justice Jackson:
In my view, the First Amendment assures the broadest tolerable exercise of free speech, free press, and free assembly, not merely for religious purposes, but for political, economic, scientific, news, or informational ends as well. When limits are reached which such communications must observe, can one go farther under the cloak of religious evangelism? Does what is obscene, or commercial, or abusive, or inciting become less so if employed to promote a religious ideology? I had not supposed that the rights of secular *171 and nonreligious communications were more narrow or in any way inferior to those of avowed religious groups.
Douglas v. Jeannette, 319 U.S. 157, 179, 63 S.Ct. 877, 888, 87 L.Ed. 1324 (1943).
As a more realistic approach to such problems as fraudulent accosting and misrepresentation, the defendants' enacted a focused booth restriction which addresses a compelling state interestthe exchange of money. This regulation is not in any manner aimed at regulating First Amendment rights, and its effect on those rights is incidental in the truest sense of the word. In its purpose and effect, defendants' booth rule focuses on the realities of speech that does "no more than propose a commercial transaction." Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at 771 n. 24, 96 S.Ct. at 1830. It seeks to guarantee the fair goer that the speaker meets the fundamental societal standard of being authentic and honest when dealing in commercial transfers. Thus, the booth rule serves to accurately identify the purveyor and his wares. The commercial speaker is in the best position to verify who they are and what they sell, and it is reasonable for the state to enact regulations which force such disclosures. Due to the "hardiness" of commercial speech, there is little chance of the state chilling First Amendment rights by its more watchful supervision of commercial activity in a booth. At the same time, since such speech is more objective there is less reason to tolerate it being inaccurate for fear that the speech will be silenced. Thus, the booth restriction, by requiring that a commercial message appear in its truthful form through "additional information, warnings, and disclaimers," serves to protect society from deception. In fact the government intrusion on plaintiffs' First Amendment rights is minimal since "[i]t is not difficult to choose statements, designs, and devices which will not deceive." Id.
In the words of Justice Jackson:
A common-sense test as to whether the Court has struck a proper balance of these rights is to ask what the effect would be if the right given to these Witnesses should be exercised by all sects and denominations. If each competing sect in the United States went after the householder by the same methods, I should think it intolerable. If a minority can put on this kind of drive in a community, what can a majority resorting to the same tactics do to individuals and minorities? Can we give to one sect a privilege that we could not give to all, merely in the hope that most of them will not resort to it? Religious freedom in the long run does not come from this kind of license to each sect to fix its own limits, but comes of hard-headed fixing of those limits by neutral authority with an eye to the widest freedom to proselyte compatible with the freedom of those subject to proselyting pressures.
Douglas v. Jeannette, 319 U.S. 157, 180, 63 S.Ct. 877, 888, 87 L.Ed. 1324 (1943). It is obvious that it would be "intolerable" if we permitted a majority to resort to the same tactics employed by the Krishnas. Today the court has allowed the setting of reasonable limits on their behavior for the future. Let there be no doubt, the court does this, not because plaintiffs' habits or beliefs are shockingly different, but rather because plaintiffs' continued actions, under the credible evidence, resemble other segments of society whose anti-social behavior has never been tolerated by the law.
Based upon the findings of facts and conclusions of law stated above, plaintiffs' complaint is hereby dismissed.
It is so ordered.

APPENDIX

Exhibit A
(Definition of activity)
1. ISKCON members will be engaged in a religious practice of:
a. talking to or otherwise communicating with third parties about their religious views.
b. disseminating religious materials including magazines, books, cards, records and other information.
c. presenting gift-greeting items such as sactified flowers and candy  or incense sticks and other small items.
d. requesting and accepting contributions from said third parties for their *172 religious literature, establishments and programs.
(Registration, liaison and fees)
2. ISKCON will provide a liaison to provide the information indicated herein and represent the society in any other necessary communications with any appropriate fair, security and government officials (city, county or state).
3. ISKCON's public affairs office may be called collect in case the liaison cannot be located at a time of needed communication. The liaison will provide this number.
4. ISKCON members will register in person or by phone at the beginning of each fair, show or event giving names and ages of members and times and places of activity to appropriate police officials, (changes will be reported immediately);
5. ISKCON members as referred to herein means only those persons designated as such by the liaison not others.
6. ISKCON members will present to appropriate state officials copies of ISKCON's State and IRS tax exempt certificates to prove the legitimacy of their society.
7. ISKCON members will pay all fees charged at the fair/event.
(Manner of activity)
8. ISKCON members will engage in said activities in a peaceable manner and without harassment to the public. Likewise, ISKCON members are entitled to due protection from harassment by the public, (including persons patronizing the fair/event, parties and their agents, contracted to run fair/event attractions and parties and their agents renting fair/event booths or facilities) as afforded by applicable Federal, State and local laws respecting breach of the peace, harassment, libel and slander etc.
9. ISKCON members while performing the activities described herein, will not be interfered with in any way by any fair/event, or involved government, agency, agents or employees.
10. ISKCON members will be issued with standard ISKCON I.D. cards and will wear them in a visible manner;
11. ISKCON members will in no way express that any fair or government agency or any organization other than ISKCON is sponsoring and/or connected with their activities.
12. ISKCON members will not massively distribute hand bills which may lead to littering, our smallest literature being a substantial magazine given only to those agreeing to take it;
13. ISKCON members will not install or cause to be installed any type of structure such as but not limited to counters, tables, chairs and signs, unless a special request is made and approved;
14. ISKCON members, no more than two at a time, will approach and engage in said activities, any individual person or party unless consented to by that party;
15. ISKCON members will not engage in any deliberate touching of unconsenting persons;
16. ISKCON members will not use any sound amplification.
(Place of activity and number of representatives)
17. ISKCON members will not perform said activities at any area not open to the general public and specifically not in private concession areas and other areas rented by private parties;
18. ISKCON members may engage in said activities in buildings open to the public only as follows:
a. At open lobbies and hallways;
b. At exhibition areas  at locations at least 10 feet from any exhibit or booth;
c. Not in any stairs
d. Not in the seating areas of any arena, lecture or performance facility.

*173 19. ISKCON members will not perform said activities with people engaged in sitting and watching a performance or other special attraction, or waiting in a ticket line, coat line or refreshment line unless prior unsolicited consent is expressed.
20. ISKCON members will not operate directly in front of any entrances/exits to the fair/event or any entrances/exits to any buildings. Directly in front, means here, no closer than 15 feet from the main entrances/exits and 10 feet from all others.
21. ISKCON, by its liaison or public affairs office only, may agree to further limitation of the locations of said activities (after discussing with appropriate officials, referred to herein) if the need for such is clearly demonstrated, to safeguard a legitimate fair/event function or interest.
NOTES
[1] Douglas v. Jeannette, 319 U.S. 157, 179, 63 S.Ct. 877, 888, 87 L.Ed. 1324 (1943).
[2] Emerson, The System of Freedom of Expression (1970) p. 10.
[3] Id. at 11.
[4] Douglas v. Jeannette, 319 U.S. at 182, 63 S.Ct. at 889.
[5] Id. at 179, 63 S.Ct. at 888.
[6] See Exhibit A attached hereto.