NAKATOMI INVESTMENTS, INC., and AEB Enterprises, Inc., Plaintiffs,

v.

CITY OF SCHENECTADY; Albert Jurczynski, Mayor of Schenectady; James Kalohn, Zoning Officer; James Pone, Building Inspector; and Michael Moffitt and Gregory T. Kaczmarek, Police Chiefs, Defendants.

No. 96–CV–1226.

United States District Court, N.D. New York.

Jan. 7, 1997.

Office of David Brickman (David Brickman, of counsel), Albany, for Plaintiffs.

Corporation Counsel for the City of Schenectady (L. John Van Norden, of counsel), Schenectady, for Defendants.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

This is a case about non-obscene nude dancing. At issue is Plaintiffs Nakatomi Investments and AEB Enterprises' desire to

operate clubs, within the City of Schenectady, that feature nude and topless dancers.

The City of Schenectady ("City") has two local laws that govern Plaintiffs' business activities. The City's Public Amusement Law regulates specific entertainment businesses and prohibits any person from exposing certain portions of the human body. *See* Schenectady City Code § 128–8.[1] In addition, the City Zoning Law requires that all "adult entertainment businesses" must be established, subject to the issuance of a Special Permit, solely within two designated zoning districts—districts G and H—as defined by the City Zoning Law. *See* Schenectady City Code § 264–91.

In early 1996, the City began an investigation into several business that were believed to be operating in violation of the City Zoning and Public Amusement laws. As a result of this investigation, various principals and employees of the Plaintiffs were arrested and charged with violating Sections 128–8 and 264–91 of the City Code.

On July 31, 1996, Plaintiffs brought this action under 42 U.S.C. §§ 1983 and 1985, claiming, *inter alia,* that the City's Zoning and Amusement laws violated their rights under the First and Fourteenth Amendments to the United States Constitution. Presently before the Court is Plaintiffs' Motion for a Preliminary Injunction seeking to enjoin Defendants from enforcing the above referenced ordinances during the pendency of this case, as well as Defendants' Cross–Motion for Summary Judgment.

## II. DISCUSSION

### A. Preliminary Injunction Standard

In this Circuit, the standard for obtaining a preliminary injunction is well established.

In order to obtain a preliminary injunction, the movant must make an affirmative showing of: (1) irreparable harm; and either (2) likelihood of success on the merits; or (3) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant. *See, e.g., Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992); *Resolution Trust Corp. v. Elman,* 949 F.2d 624, 626 (2d Cir.1991); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). The Second Circuit, however, has also held that "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim." *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989); *see also Union Carbide Agricultural Products Co. v. Costle,* 632 F.2d 1014, 1018 (2d Cir. 1980).

Courts in this circuit have repeatedly stated that " '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.' " *Borey v. National Union Fire Ins. Co.,* 934 F.2d 30, 34 (2d Cir.1991) (*quoting Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 719 F.2d 42, 45 (2d Cir.1983)). Moreover, the party seeking the preliminary injunction must demonstrate that "it is *likely* to suffer irreparable harm if equitable relief is denied." *Borey,* 934 F.2d at 34 (*quoting JSG Trading Corp. v. Tray-*

---

1. Specifically, § 128–8 states in relevant part:

A. It shall be unlawful for any female person to appear, work, entertain, act or display herself in any cabaret, dance hall, bar, tavern, lounge, discotheque or restaurant clothed or costumed in such a manner that a portion of the breast below the top of the areola is not covered with a fully opaque covering or in such a manner that the genitals, pubic area or buttocks are not covered with a fully opaque covering.

B. It shall be unlawful for any male to appear, work, entertain, act or display himself in any cabaret, dance hall, bar, tavern, lounge, discotheque or restaurant clothed or costumed in such a manner that the genitals, pubic area or buttocks are not covered with a fully opaque covering.

C. It shall be unlawful for any person to knowingly conduct, maintain, own, lease, manage, operate or furnish any cabaret, dance hall, bar, tavern, lounge, discotheque or restaurant where a female or male person is not clothed, costumed or covered as required herein.

*Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990)) (emphasis in original). Hence, a mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction. *Borey,* 934 F.2d at 34. It must be noted that "irreparable injury means injury for which a monetary award cannot be adequate compensation." *Jackson Dairy,* 596 F.2d at 72 (*citing Studebaker Corp. v. Gittlin,* 360 F.2d 692, 698 (2d Cir.1966) and *Foundry Srvs., Inc. v. Beneflux Corp.,* 206 F.2d 214, 216 (2d Cir.1953)).

■ Turning our attention to the first prong of this test, it is clear that if the City's enforcement will deprive Plaintiffs of their First Amendment right of expression, this constitutes *per se* irreparable injury to Plaintiffs. *See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). In *Elrod v. Burns,* the Supreme Court instructed that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. at 373, 96 S.Ct. at 2690; *see also Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir. 1991) (stating that even a temporary abridgment of the First Amendment right to free expression constitutes irreparable injury).

Accordingly, inasmuch as the City's enforcement of its ordinances against Plaintiffs for even one day would result in a loss of First Amendment rights, that enforcement constitutes irreparable injury to these plaintiffs. Thus, Plaintiffs have satisfied the first of the two elements required for a preliminary injunction.

Having found that Plaintiffs will suffer irreparable harm in the absence of injunctive relief, the Court must determine whether Plaintiffs are likely to succeed on the merits of their constitutional challenge. Contrary to the position asserted by the City, the burden rests squarely on the City to justify its infringement of Plaintiffs' rights. Indeed, it has long been axiomatic that once a party shows that a regulation deprives them of a protected First Amendment interest, the burden shifts to the Government to justify the infringement. *See, e.g., Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 803 n. 22, 104 S.Ct. 2118, 2127 n. 22, 80 L.Ed.2d 772 (1984); *City of Los Angeles v.*

*Preferred Communications, Inc.,* 476 U.S. 488, 496, 106 S.Ct. 2034, 2038–39, 90 L.Ed.2d 480 (1986). The Supreme Court reiterated this burden shifting in *Schad v. Borough of Mt. Ephraim,* 452 U.S. 61, 66, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981). In *Schad,* after reaffirming that nude dancing is expressive conduct within the scope of the First Amendment, the Supreme Court shifted the burden to the government to justify "its substantial restriction of protected activity." 452 U.S. at 66, 72, 101 S.Ct. at 2181, 2184. Ultimately, the *Schad* Court invalidated the anti-nudity statute because the government could not justify the infringement. 452 U.S. at 72, 101 S.Ct. at 2184–85; *cf. Travis v. Owego–Apalachin School Dist.,* 927 F.2d 688, 694 (2d Cir.1991) (invalidating statute because defendant school district failed to justify its restriction on speech and religion).

Here, it is not unreasonable to expect that a City purporting to infringe upon a First Amendment right be prepared to defend that infringement; if the City cannot adequately justify its encroachment, then the restriction is rightfully unconstitutional. *See O'Malley v. City of Syracuse,* 813 F.Supp. 133, 141 (N.D.N.Y.1993); *cf. Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843–44, 98 S.Ct. 1535, 1543–44, 56 L.Ed.2d 1 (1978) (initial burden is on government to justify restriction; defendant then has opportunity to challenge the government's proffered justification).

Here, Plaintiffs are challenging the constitutionality of two City ordinances. The Court will review these challenges *seriatim.*

**B. Likelihood of Success on the Merits**

■ In a republic founded on a democratic ideal, there is perhaps no greater safeguard of freedom than the unfettered exchange of ideas. The First Amendment protects the expression of ideas, especially unpopular ideas. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 404, 414, 109 S.Ct. 2533, 2539–40, 2545, 105 L.Ed.2d 342 (1989); *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55–56, 108 S.Ct. 876, 881–82, 99 L.Ed.2d 41 (1988); *Federal Communications Comm'n v. Pacifica Foundation,* 438 U.S. 726, 745–46, 98 S.Ct. 3026,

3038–39, 57 L.Ed.2d 1073 (1978). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive...." *Johnson*, 491 U.S. at 414, 109 S.Ct. at 2545 (citations omitted); *see also Street v. New York*, 394 U.S. 576, 592, 89 S.Ct. 1354, 1365–66, 22 L.Ed.2d 572 (1969). The fact that the expression is not in the form of verbal communication is irrelevant. It is now settled, for example, that performances in theatres are entitled to First Amendment protection even though they do not square with the traditional definition of speech because such performances "may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *California v. LaRue*, 409 U.S. 109, 129, 93 S.Ct. 390, 403, 34 L.Ed.2d 342 (1972) (Marshall, J., dissenting); *see also Johnson*, 491 U.S. at 404–06, 109 S.Ct. at 2539–41 (First Amendment protection is not limited to the spoken word but extends to the expression of ideas).

Not surprisingly, an individual's interest in freedom of expression sometimes clashes with the government's interest in societal order so directly that the two positions are irreconcilable. In these cases, one interest must give way to the other. *See, e.g., International Soc'y for Krishna Consciousness, Inc. v. Barber*, 506 F.Supp. 147, 148–49 (N.D.N.Y.1980), *rev'd on other grounds*, 650 F.2d 430 (2d Cir.1981). The instant case presents the Court with the difficult task of balancing these important but competing interests.

For almost twenty-years the Supreme Court has recognized that nude dancing of the kind involved here is expressive conduct protected by the First Amendment. The Court first addressed this issue in the context of adult entertainment in *California v. LaRue*, 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), where local bar owners sought a declaratory judgment that regulations promulgated by California's Department of Alcohol Beverage Control regulating the type of entertainment that could be pre-

sented in nightclubs or bars were unconstitutional. The regulations in question "provided that liquor by the drink shall not be served in places where certain grossly sexual exhibitions are performed." *LaRue*, 409 U.S. at 119, 93 S.Ct. at 397 (Stewart, J., concurring). In overturning the district court's grant of declaratory judgment, the *LaRue* Court held that the State was empowered under the Twenty–First Amendment to regulate such entertainment in establishments that serve liquor. However, the Court stated that "some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression." *LaRue*, 409 U.S. at 118, 93 S.Ct. at 397.

Two years later, the justices strengthened their recognition that nude dancing is protected expression. In *Doran v. Salem Inn*, 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), owners of three topless bars sought a temporary injunction against a Northhampton, New York town ordinance that prohibited topless dancing in "[a]ny public place." 422 U.S. at 922, 95 S.Ct. at 2563. Justice Rehnquist wrote that "[a]lthough the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression, we recognized [in *LaRue*] that this form of entertainment might be entitled to First and Fourteenth Amendment protection in some circumstances." *Doran* 422 U.S. at 932, 95 S.Ct. at 2568.

Moreover, in *Schad v. Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), the majority's position on nude dancing was accepted by the entire Court. In *Schad*, the Court noted that "as the state courts in this case recognized, nude dancing is not without its First Amendment protections from official regulation." 452 U.S. at 66, 101 S.Ct. at 2181. Since *Schad*, the Supreme Court has consistently reaffirmed its position that nude dancing performed as entertainment falls within the scope of the First Amendment. For example, in *Young v. Arkansas*, 474 U.S. 1070, 106 S.Ct. 830, 88 L.Ed.2d 801 (1986), Justices White and Brennan, dissenting from denial of *certiorari*, noted the Court's "repeated indications that barroom nude dancing is a type of expression

that is protected under the First Amendment" and urged an explicit holding regarding the scope of that protection. 474 U.S. at 1070, 106 S.Ct. at 830–31. In *Sable Communications v. FCC*, 492 U.S. 115, 124–26, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989), the majority wrote that "[s]exual expression which is indecent but not obscene is protected by the First Amendment." *See also New York State Liquor Auth. v. Bellanca*, 452 U.S. 714, 719, 101 S.Ct. 2599, 2602, 69 L.Ed.2d 357 (1981) (Stevens, J., dissenting) (stating that in *LaRue* the Court recognized "the protected expression implicated by nude dancing"). In addition, in *Paris Adult Bookstore II v. City of Dallas*, 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Court addressed a challenge to an ordinance enacted by the City of Dallas regulating "sexually oriented businesses" through a scheme incorporating zoning, licenses, and inspections. In *Paris Adult Bookstore II*, various adult establishments, including several providing nude dancing, sued for declaratory relief and a temporary as well as a permanent injunction. 493 U.S. at 215, 110 S.Ct. at 596. Six justices agreed that the ordinance violated the First Amendment by establishing a licensing scheme without adequate procedural safeguards, although the majority split as to what safeguards are required. *Paris Adult Bookstore II*, 493 U.S. at 223–25, 110 S.Ct. at 604.

The high Court's most recent exegesis on this issue came in *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), in which eight of the nine Justices again stated that nude dancing is expressive conduct within the protection of the First Amendment. Although the plurality held that an Indiana Public Indecency law requiring that erotic dancers wear pasties and G-strings[2] was constitutional, *Barnes* engendered four separate opinions, none of which commanded a majority of the Justices.

*See Barnes*, 501 U.S. at 561–63, 111 S.Ct. at 2457–59 (opinion of Rehnquist, C.J., joined by O'Connor and Kennedy, JJ.); *id.* at 571–72, 111 S.Ct. at 2463–64 (Scalia, J., concurring); *id.* at 580–82, 111 S.Ct. at 2467–69 (Souter, J., concurring); *id.* at 587, 111 S.Ct. at 2471 (White, J., dissenting, joined by Marshall, Blackmun, and Stevens, JJ.). Chief Justice Rehnquist's attempt to win acceptance for the proposition that the enforcement of *morality* is a proper basis for limiting freedom of speech did not win majority support: only Justices O'Connor and Kennedy joined the Rehnquist opinion. *Barnes*, 501 U.S. at 561–63, 111 S.Ct. at 2457–59. While Justice Souter agreed with the Chief Justice that the Indiana statute was properly analyzed under the traditional First Amendment four-part test articulated in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), he identified *secondary effects*, not moral concerns, as the basis for restricting First Amendment protection of expressive conduct. *Barnes*, 501 U.S. at 582, 111 S.Ct. at 2468–69 ("I nonetheless write separately to rest my concurrence in the judgment, not on the possible sufficiency of society's moral views to justify the limitations at issue, but on the State's substantial interest in combating the secondary effects of adult entertainment establishments of the sort typified by respondents' establishments.").[3]

As the Sixth Circuit has remarked, deriving the significance of the *Barnes* decision is like "reading tea leaves." *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 134–35 (6th Cir.1994). Nevertheless, the Supreme Court has instructed that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" *Marks v.*

---

**2.** Pasties: "[A] pair of small, cup-like coverings for the nipples of a striptease dancer." *Random House Dictionary of the English Language* (1979). G-string: "[A] loincloth or breechcloth." *Id.*

**3.** Justice Scalia, the fifth Justice concurring in the result, concluded that nude dancing is not inherently expressive activity, and thus not entitled to First Amendment protection at all. *Barnes*, 501 U.S. at 561, 111 S.Ct. at 2458 (concluding that "[m]oral opposition to nudity supplies a rational basis for its prohibition, and since the First Amendment has no application to this case, no more than that is needed"). Justice White, joined by Justices Marshall, Blackmun, and Stevens, dissented.

*United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (emphasis added) (*citing Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923, n. 15, 49 L.Ed.2d 859 (1976)). Indeed, this is not the first time a lower federal court has had to divine the meaning from an increasingly polarized Supreme Court. *See, e.g., Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1183 (2d Cir.) ("Despite the inarguable fact that only four justices in *Price Waterhouse [v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)] would have imposed a 'direct evidence' requirement for 'mixed-motives' cases, most circuits have engrafted this requirement into caselaw."), *cert. denied,* 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). While "there is some awkwardness in attributing precedential value to an opinion of one Supreme Court justice to which no other justice adhered, it is the usual practice when that is the determinative opinion." *Blum v. Witco Chemical Corp.,* 888 F.2d 975, 981 (3d Cir.1989) (following Justice O'Connor's concurring opinion in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987)).

Regardless of the precise approach taken, this Court must derive a controlling standard from two apparently conflicting opinions: the plurality opinion and Justice Souter's concurrence. *See Redner v. Dean,* 29 F.3d 1495, 1499 (11th Cir.1994) ("When faced with a fragmented Court, we may distill the various opinions down to their narrowest grounds of concurrence to derive any binding precedent.") (*citing Marks,* 430 U.S. at 193, 97 S.Ct. at 993–94). Moreover, the determination of which opinion resolved the issue in *Barnes* on "the narrowest grounds" does not end the inquiry required here. Rather, this Court is still left with the daunting task of obtaining a workable standard from the two concurrences that comports with the plurality's overall holding in *Barnes* as well as with the Supreme Court's prior precedent, and applying that standard to the facts presented here.

Applying the *Marks* rule to the decision in *Barnes,* at least one court has concluded that Justice Souter's concurring opinion set forth a subset of the principles articulated in the plurality opinion. In *Triplett Grille, Inc. v. City of Akron,* the Sixth Circuit concluded: "As a logical consequence of their approval of morality justifications for regulations of speech, Chief Justice Rehnquist, Justice O'Connor and Justice Kennedy implicitly agreed with Justice Souter that governmental efforts to control the harmful secondary effects associated with adult entertainment can serve as a basis for restricting activities that enjoy First Amendment protection." 40 F.3d 129, 134–35 (6th Cir.1994). The *Triplett* court quoted the following language in support of its conclusion that the *Barnes* plurality's rationale implicates material harms as one of the legitimate governmental interests justifying the regulation of speech:

> This and other public indecency statutes were designed to protect morals and public order. The traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis for legislation.... Thus, the public indecency statute furthers a substantial government interest in protecting order and morality.

*Barnes,* 501 U.S. at 569, 111 S.Ct. at 2462 (citations omitted).

Other courts have found that Justice Souter's opinion merely articulates a common underlying approach. *See International Eateries of Am., Inc. v. Broward County,* 941 F.2d 1157, 1160–61 (11th Cir.1991) (concluding, based on Justice Souter's opinion, that "in order to uphold a statute regulating nude dancing, it is still necessary after *Barnes* that the statute meet the secondary effects test"), *cert. denied,* 503 U.S. 920, 112 S.Ct. 1294, 117 L.Ed.2d 517 (1992); *Cafe 207, Inc. v. St. Johns County,* 856 F.Supp. 641 (M.D.Fla. 1994), *aff'd,* 66 F.3d 272 (11th Cir.1995); *SBC Enterprises, Inc. v. City of South Burlington,* 892 F.Supp. 578, 582 (D.Vt.1995).

In *Barnes,* four of the justices voting to uphold the Indiana statute as applied to nude dancing at adult entertainment facilities agreed that the proper test was the four-part test established in *United States v. O'Brien.* Under *O'Brien,*

> a governmental regulation is sufficiently justified if it is within the constitutional

power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restrictions on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien,* 391 U.S. at 376–77, 88 S.Ct. at 1679, *quoted in, Barnes,* 501 U.S. at 567, 111 S.Ct. at 2460–61.

However, in applying the *O'Brien* test, the opinions comprising the decision in *Barnes* articulated two different governmental interests justifying the limitation on First Amendment expression.[4] Justice Rehnquist wrote that the Indiana law, which requires the wearing of pasties and G-strings covering certain anatomical areas, "furthers a substantial government interest in protecting *order and morality.*" *Barnes* at 569, 111 S.Ct. at 2462 (emphasis added). Justice Souter on the other hand, did not agree with Justices Rehnquist, O'Connor and Kennedy, and wrote that "I . . . write separately to rest my concurrence in the judgment, not on the possible sufficiency of society's moral views to justify the limitations at issue, but on the State's substantial interest in combating the *secondary effects* of adult entertainment establishments of the sort typified by respondents' establishments." *Barnes,* 501 U.S. at 582, 111 S.Ct. at 2468–69 (Souter, J. concurring) (emphasis added).

This statement by Justice Souter casts doubt on the proposition that his concurrence articulated a subset of the principles contained in the plurality opinion. *See, Triplett Grille,* 40 F.3d at 134–35. Instead, Justice Souter appears to rely on a different—and *distinct*—governmental interest. *See Int'l Eateries,* 941 F.2d at 1161 ("Justice Souter, whose vote was necessary to uphold the statute, stated that morality justifications were *not* a substantial government interest, but that control of secondary effects did constitute such an interest.") (emphasis added). This leaves unsettled the question of whether

his concurrence resolved the issue in *Barnes* on the narrowest grounds and/or whether his rationale comports with the rationale articulated by the plurality opinion.

According to Justice Souter, Indiana's requirement that nude dancers wear pasties and G-strings is justified by Indiana's interest in the reduction of secondary effects associated with adult establishments. Specifically, Justice Souter states: "In my view, the interest asserted by petitioners in preventing prostitution, sexual assault, and other criminal activity, although presumably not a justification for all applications of the statute, is sufficient under *O'Brien* to justify the State's enforcement of the statute against the type of adult entertainment at issue here." *Barnes,* 501 U.S. at 583, 111 S.Ct. at 2469. Justice Souter goes on to write:

> [I]t is clear that the prevention of such evils falls within the constitutional power of the State, which satisfies the first *O'Brien* criterion. The second *O'Brien* prong asks whether the regulation 'furthers an important or substantial governmental interest.'

*Barnes,* 501 U.S. at 583, 111 S.Ct. at 2469. It is in Justice Souter's resolution of this second prong of the *O'Brien* test, ie. whether the Indiana statute in question *furthers* the state's interest in reducing the associated secondary effects, that this Court sees conflict with the plurality opinion in *Barnes.*

There is little doubt, and indeed Justice Souter amply notes, that pernicious secondary effects *are* associated with adult entertainment establishments. *See Barnes,* 501 U.S. at 584, 111 S.Ct. at 2470 ("It therefore is no leap to say that live nude dancing of the sort at issue here is likely to produce the same pernicious secondary effects as the adult films displaying 'specified anatomical areas' at issue in *Renton* [*v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).")] (Souter, J. concurring) (*citing United States v. Marren,* 890 F.2d 924, 926 (7th Cir.1989) (prostitution associated with nude dancing establishment);

---

**4.** Of the five justices voting to uphold the Indiana statute and the four justices finding the statute unconstitutional, only Justice Scalia concluded that the conduct in question was completely outside the First Amendment's protection. Accordingly, Justice Scalia did not apply the *O'Brien* four-part test.

*United States v. Doerr,* 886 F.2d 944, 949 (7th Cir.1989) (same)). However, Justice Souter never explicitly addresses the question of *how* the Indiana statute, which requires the wearing of pasties and G-strings, will reduce the incidents of prostitution, sexual assault, and drug use.

Under the *O'Brien* test, Indiana's indecency statute, requiring that erotic dancers wear pasties and G-strings, must *further* the government's interest in the reduction of secondary effects. Inherent in the term "further" is the requirement that the regulation reduce, however incrementally, the evil being addressed. Examples of this causal connection might include the following: Indiana's insistence that erotic dancers partially cover their breasts and buttocks will reduce the incidents of prostitution *because* the dancers can no longer perform their erotic dances completely topless and therefore the patrons of prostitutes will be less aroused and thus less likely to engage the services of a prostitute. Similarly, Indiana's requirement that erotic dancers partially cover their breasts and buttocks might also further the governmental interest in the reduction of secondary effects if drug buyers and sellers will somehow become less inclined to transact their business in and around these establishments because the dancers are required to wear pasties and G-strings. However, even a cursory examination of these justifications reveals their deficiency.

Perhaps it is the "atmosphere" associated with adult establishments in Indiana that attracts prostitution and drug dealing. If that atmosphere is intertwined with the eroticism associated with the dancers and that eroticism is reduced by the wearing of clothing, then it follows that the attraction would be diminished and it is thus logical to assume that the secondary effects associated with the patrons will also be reduced. However, Justice Souter dismisses this connection, and indeed he must do so to avoid *O'Brien*'s requirement that the regulation be *unrelated* to the expression itself; to do otherwise would be to target the expression itself. *See, e.g., Texas v. Johnson,* 491 U.S. 397, 420, 109 S.Ct. 2533, 2548, 105 L.Ed.2d 342 (1989) (prohibition of flag burning held to aim at protest message rather than at maintenance of peace or protection of public symbols); *Tinker v. Des Moines Indep. Community Sch. Dist.,* 393 U.S. 503, 509–10, 89 S.Ct. 733, 737–39, 21 L.Ed.2d 731 (1969) (prohibition of wearing arm bands held to aim at squelching protest rather than at prevention of school disruption); *Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 535–36, 75 L.Ed. 1117 (1931) (prohibition of red flag display held to aim at protest message rather than at maintenance of public order). For example, Justice Souter wrote:

> To say that pernicious secondary effects are associated with nude dancing establishments is not necessarily to say that such effects result from the persuasive effect of the expression inherent in nude dancing. It is to say, rather, only that the effects are correlated with *the existence of establishments offering such dancing,* without deciding what the precise causes of the correlation actually are.

*Barnes,* 501 U.S. at 585–86, 111 S.Ct. at 2470 (emphasis added).

However, in *Barnes* the Indiana legislature was not banning the "existence" of these establishments; rather, it was requiring that nude dancers wear pasties and G-strings. Presumably, under the Indiana Indecency statute at issue in *Barnes,* the adult establishments could continue to exist so long the erotic dancers partially covered their breasts and buttocks with an opaque covering, which in fact they did.

Moreover, to pass constitutional muster under *O'Brien,* which Justice Souter acknowledges articulates the appropriate test, Indiana's statute, requiring that erotic dancers wear pasties and G-strings, must somehow *further* Indiana's interest in reducing prostitution and drug use. To wit, Indiana must demonstrate that its regulatory scheme, at a minimum, makes sense based on the objectives sought to be obtained. This is not to say that a governmental entity must isolate the precise causes of the correlation between the regulated activity and the detrimental secondary effect. However, where the government is seeking to restrain the free expression of its citizens, the Supreme Court has invariably held that the burden

falls on the government to justify the infringement. *See, e.g., Schad,* 452 U.S. at 72, 101 S.Ct. at 2184–85 (shifting the burden to the government to justify "its substantial restriction of protected activity"); *Taxpayers for Vincent,* 466 U.S. at 803 n. 22, 104 S.Ct. at 2127 n. 22; *Preferred Communications, Inc.,* 476 U.S. at 496, 106 S.Ct. at 2038–39.

Recognizing this important requirement, the plurality in *Barnes* was careful to note that Indiana's interest in order and morality was *furthered* by directly banning the "evil" itself: nudity. *See Barnes,* 501 U.S. at 571, 111 S.Ct. at 2463 ("Public nudity is the evil the state seeks to prevent"). In comparison, the "evil" that Justice Souter addresses is "prostitution, sexual assault and other criminal activity." *Barnes,* 501 U.S. at 583, 111 S.Ct. at 2469. Clearly, the government has the power to ban prostitution, drug use, and sexual assault. Indeed, better enforcement of existing laws against prostitution and drug use will undoubtedly *further* the government's interest in reducing these activities. However, if the government seeks to *indirectly* address these same evils by requiring that dancers engaged in expressive First Amendment activity wear pasties and G-strings, the Constitution requires that there be some connection between the restriction and the evil sought to be eradicated.

Moreover, applying the lax standard articulated by Justice Souter to its logical conclusion, one naturally comes to the point where the government can ban all forms of erotic dancing, nude or otherwise, so long as there are pernicious side effects somehow associated with the performance. Indeed, courts have already begun moving down this road. For example, in *Cafe 207, Inc. v. St. Johns County,* 856 F.Supp. 641 (M.D.Fla.1994), *aff'd,* 66 F.3d 272 (11th Cir.1995), the District Court held that an ordinance requiring that dancers wear more clothing than required by Indiana's Public Indecency Law was constitutional. Relying on *Barnes* and Justice Souter's governmental interest in the reduction of pernicious side effects, the District Court in *Cafe 207* wrote:

> Once it is established that a burden may be imposed on the expressive content of erotic dancing by requiring some cloth-ing—pasties and a G-string—then it does not seem to me from a constitutional standpoint that a modest increase in the amount of body covering required by the law really adds any significant, incremental burden on the expressive component of the dance.

856 F.Supp. at 646 (emphasis removed). What the District Court and Justice Souter ignore, however, is that the constitutional limitation is the requirement that the incremental restriction on expression must result in an incremental *furthering* of the purported governmental interest. To wit, each additional piece of required clothing must result in a further reduction in pernicious side effects. Without demanding this connection at each step, each additional layer of restriction can be legally added simply on the basis that the previous restriction was valid, until the entire activity is banned: i.e. nude dancing is permitted so long as the dancers wear pasties and G-strings; then bathing suits; then t-shirts; then long pants and a sweater. *See Bright Lights, Inc. v. City of Newport,* 830 F.Supp. 378, 381 (E.D.Ky.1993) (upholding ordinance requiring that dancers wear bathing suits). In recognition of the danger of creeping encroachment, the First Amendment requires, not that the restriction be merely *related* to the governmental interest asserted, but rather that each restriction imposed *furthers* an important or substantial governmental interest. *See O'Brien,* 391 U.S. at 376–77, 88 S.Ct. at 1678–79. To require otherwise would be to adopt Justice Scalia's position that nude dancing is "not subject to First Amendment scrutiny at all," *Barnes,* 501 U.S. at 572, 580, 111 S.Ct. at 2463, 2467–68 (merely applying rational basis test), a position that the Supreme Court has never taken, and indeed a position that the plurality in *Barnes* expressly rejected.

In Justice Souter's concurring opinion in *Barnes,* there is simply no mention of how Indiana's indecency statute, requiring that erotic dancers partially cover their breasts and buttocks, will reduce the incidents of prostitution, drug use, and sexual assault. This oversight is most likely due to the fact, as this Court has found here, that no logical relationship exists between the percent of a

woman's breast that is visible (in *Barnes,* Indiana simply required the covering of the nipple) and the number of prostitutes operating outside an adult establishment. *Accord, Steverson v. City of Vicksburg,* 900 F.Supp. 1, 12 (S.D.Miss.1994) ("the Court cannot construe any factual basis which would demonstrate that the City ordinanced a ban of adult entertainment featuring live nude or semi-nude dancing in order to preserve its asserted interest in curtailing secondary effects"). For this reason, this Court must find that Justice Souter's concurrence did not "set forth a subset of the principles articulated in the plurality opinion" nor did it articulate a common underlying approach that comports with the plurality opinion and prior Supreme Court precedent. *Cf. Int'l Eateries,* 941 F.2d at 1162 n. 3 (finding that "[b]ecause Justice Souter wrote only for himself in *Barnes,* we continue to follow the *Renton* Court's approach of gleaning the government interest at stake from the ordinance itself rather than implying one where none is evident in the ordinance"). Accordingly, Justice Souter's concurrence is not the narrowest opinion entitled to precedential authority under *Marks,* and this Court is thus constrained to follow the plurality opinion in *Barnes.*

### i. § 128–8's ban on nudity

■ Section 128–8 of Schenectady's City Code states, in relevant part, that:

A. It shall be unlawful for any female person to appear, work, entertain, act or display herself in any cabaret, dance hall, bar, tavern, lounge, discotheque or restaurant clothed or costumed in such a manner that a portion of the breast below the top of the areola is not covered with a fully opaque covering or in such a manner that the genitals, pubic area or buttocks are not covered with a fully opaque covering.

Schenectady City Code § 128–8.

Addressing the appropriate governmental interest, the Court must determine how the

City of Schenectady's ordinance, banning nudity in the seven enumerated establishments, furthers the governmental interest in protecting order and morality. Ostensibly, order and morality are furthered by restricting what the plurality in *Barnes* termed the "evil" itself: the nude form. *See Barnes,* 501 U.S. at 571, 111 S.Ct. at 2463 ("Public nudity is the evil the state seeks to prevent"). Here, it can certainly be argued that § 128–8's ban furthers the City's protection of order and morality.[5]

However, in order to pass constitutional muster under the third prong of the *O'Brien* test, the "governmental interest must be *unrelated* to the suppression of free expression." 391 U.S. at 377, 88 S.Ct. at 1679 (emphasis added). Here, unlike the Indiana law at issue in *Barnes,* which the *Barnes* Court took pains to note was a "general law" banning all nudity, *see Barnes* at 568, 111 S.Ct. at 2461 ("enacted as general prohibition") (Rehnquist, C.J.); *id.* at 572, 111 S.Ct. at 2463–64 (Scalia, J. concurring), Schenectady's ordinance targets only seven enumerated establishments. Schenectady's ban is thus not a ban on nudity generally, but a targeted ban aimed at certain establishments. *Accord, Int'l Eateries,* 941 F.2d at 1161 (concluding that the statute at issue in *Barnes* was different in a significant respect because "in *Barnes,* the statute prohibited all public nudity," whereas "Broward County's distance ordinances only apply to 'designated uses,' which include the 'adult nightclub' involved in this case"); *Steverson v. City of Vicksburg,* 900 F.Supp. 1, 10 (S.D.Miss.1994) ("the Supreme Court in *Barnes* upheld the Indiana law inasmuch as the law banned the asserted evil of public nudity, *as a whole,* in an effort to promote societal order and morality") (emphasis in original).

Consequently, it is necessary to ascertain the distinctions between the seven establish-

---

**5.** In its analysis of this difficult constitutional question, the Court does not wish to belittle in any way a community's interest in protecting order and morality. Indeed, it is a hoary principle in our society that a community has an interest, in fact an obligation, to protect order and preserve the quality of life. These interests are clearly recognized as desirable objectives of a democratic government in a civilized society.

*See, e.g., Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 2452–53, 49 L.Ed.2d 310 (1976); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 61, 93 S.Ct. 2628, 2637, 37 L.Ed.2d 446 (1973); *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 2128–29, 80 L.Ed.2d 772 (1984).

ments where nudity is illegal and, for example, the theatre (where *Oh Calcutta* might be performed) or the opera (where Richard Strauss's *Dance of the Seven Veils* might be performed) where nudity is permitted. Each establishment requires a stage, music, dancing, an audience, and, of course, nudity. Is a cabaret different from the theatre or opera, to such a degree as to justify disparate treatment by the City of Schenectady in its role as protector of order and morality, merely because the audience is "less cultured"? Because the music originates from a stereo speaker rather than an orchestra? Because a cabaret dancer performs to Elvis rather than Tchaikovsky? Because the costumes in a theatre or opera are more elaborate? Because cabaret dancers earn tips? Perhaps the establishments are distinguishable because the dances in a cabaret are not formally choreographed. Perhaps the City of Schenectady finds the performances in cabarets more objectionable because the audience is mostly men who prefer to drink Budweiser, while they view the naked form engaged in dance, rather than the couples at the opera who prefer Dom Perignon with their falsetto.[6]

■ Examined individually, these distinctions melt away to become simply criticisms. As the Second Circuit has stated: "[W]hile the entertainment afforded by a nude ballet at Lincoln Center to those who can pay the price may differ vastly in content (as viewed by judges) or in quality (as viewed by critics), it may not differ in substance from the dance viewed by the person [at the local pub]." *Salem Inn, Inc. v. Frank,* 522 F.2d 1045 (2d Cir.1975) (*quoting Salem Inn, Inc. v. Frank,* 501 F.2d 18, 21 n. 3 (2d Cir.1974), *aff'd in part, Doran,* 422 U.S. at 922, 95 S.Ct. at

2563). Moreover, it is well established that "[n]udity alone does not place otherwise protected material outside the mantle of the first amendment." *Schad,* 452 U.S. at 66, 101 S.Ct. at 2181 (citation omitted). Nor does the fact that the dance is sexual remove the Constitution's protection: "Sexual expression which is indecent but not obscene is protected by the First Amendment." *Sable Communications v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). And, it is immaterial for constitutional purposes that nude dancing may be performed for profit. *See Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

The only logical distinction of legal relevance here is that the "erotic message" displayed by the dancers at a cabaret, dance hall, bar, tavern, lounge, discotheque or restaurant, which is arguably not presented, or at least not as strongly presented in Strauss's *Dance of the Seven Veils* or in *Oh Calcutta,* is more offensive to the City of Schenectady's legislators. In the end, the City's position distills down to the assertion that nude dancing in the seven enumerated establishments is distasteful and/or morally repugnant as compared to the same conduct presented in the theatre or opera. Accordingly, the Court must conclude that § 128–8 of the Schenectady City Code targets these seven establishments based on their distasteful erotic message, which the City finds objectionable; there is no other plausible distinction justifying disparate treatment in furtherance of the City's protection of order and morality.

This is precisely the kind of censorship, however, against which the First Amend-

---

**6.** Although Judge Flaum's decision that the Indiana statute at issue in *Barnes* was unconstitutional, was ultimately reversed by the Supreme Court, he echoes this point exactly when he writes:

> The dominant theme communicated here by the dancers is an emotional one; it is one of eroticism and sensuality. Though this dance is clearly of inferior artistic and aesthetic quality as contrasted with a classic ballet such as the Dance of the Seven Veils in Strauss' *Salome,* the erotic message communicated to the viewers is present in both performances. That Strauss' *Salome* tells a compelling story and

> the nude dancing at the Kitty Kat Lounge may not, is not determinative; expression does not lose its protection for lack of a scripted plot. And it is apparent that those who view the respective dances readily comprehend the intended messages, for they advance currency to view them. The success of both the ballerina in an erotic production and the nude dancer in a barroom setting depend on the communication of their sensual message.

*Miller v. Civil City of South Bend,* 904 F.2d 1081 (7th Cir.1990) (en banc), *reversed, Barnes,* 501 U.S. at 565, 111 S.Ct. at 2459–60.

ment aims to guard. "When the government, acting as censor, undertakes selectively to shield the public from some kinds of [expression] on the grounds that they are more offensive than others, the First Amendment strictly limits its power." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975). As Justice Harlan eloquently stated in *Cohen v. California*, 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284 (1971), "we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." Although we may find the expression inherent in nude dancing to be objectionable, "[i]f there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. at 414, 109 S.Ct. at 2545.

■■■■ Consequently, Schenectady's attempt to ban nude dancing in pursuit of its aforementioned interest is a forbidden interference because it seeks to withdraw this non-obscene and protected communication from the realm of public discourse *only* at the seven enumerated establishments. This is not to suggest that the City is powerless to regulate the presentation of nude dancing. On the contrary, the City retains a great deal of control. A sovereign may establish reasonable time, place and manner restrictions on protected expression. *See Renton*, 475 U.S. at 46–47, 106 S.Ct. at 928–29. Such legislative power unquestionably permits the City to bar the imposition of nude dancing upon the public in settings such as streets, parks and beaches. Similarly, it may regu-

late expressive conduct for reasons unrelated to the suppression of speech. *See O'Brien*, 391 U.S. at 367, 88 S.Ct. at 1673. It may also regulate nude dancing under the power granted by the Twenty–First Amendment. *See LaRue*, 409 U.S. at 109, 93 S.Ct. at 392; *City of Newport v. Iacobucci*, 479 U.S. 92, 107 S.Ct. 383, 93 L.Ed.2d 334 (1986). And, it certainly may ban obscene nude dancing. *Sable Communications*, 492 U.S. at 123–24, 109 S.Ct. at 2835. Despite the City's laudable concerns, the ban at issue here does not fall within any of these constitutionally permissible areas of legislation. If the City wishes to regulate non-obscene expressive activity, it may do so, but only in consonance with the First Amendment.

Accordingly, Plaintiffs have shown, "along with irreparable injury, a likelihood that [they] will succeed on the merits of [their] claim." *Plaza Health Laboratories*, 878 F.2d at 580. Thus, Plaintiffs have met their burden in establishing that a preliminary injunction should be issued enjoining the City of Schenectady from enforcing § 128–8 of the Schenectady City Code.

### ii. Zoning Law § 264–91

Section 264–91 of the City of Schenectady's Zoning Law states, in relevant part:

Adult bookstores and adult entertainment establishments may be established subject to the issuance of a special permit as provided in Article XI in the G District and H District only and subject to the requirements hereinafter set forth.

Schenectady City Code § 264–91(C).[7]

■■■ As discussed previously, while nude dancing enjoys some degree of First Amendment protection, it is not immune from governmental regulation. For example, it is

---

7. § 264–91 also sets forth the following location requirements for all adult bookstores and adult entertainment establishments:

(1) It shall be unlawful to hereafter establish any adult bookstore and/or adult entertainment establishment within five hundred (500) feet of any building containing one (1) or more dwelling units or rooming units.

(2) It shall be unlawful to hereafter establish any adult bookstore and/or adult entertainment-establishment within five hundred (500) feet of any other adult bookstore or adult entertainment establishment.

(3) It shall be unlawful to hereafter establish any adult bookstore and/or adult entertainment establishment within one thousand (1,000) feet from the property line of any public, private or parochial school, library, park or playground and/or within five hundred (500) feet from the nearest property line of any church, convent, monastery, synagogue or other place of worship.

Schenectady City Code § 264–91(D).

within the constitutional power of a municipality to adopt zoning regulations that limit the areas in which adult entertainment enterprises may operate. *See Renton,* 475 U.S. at 41, 106 S.Ct. at 925.

The leading Supreme Court case addressing this issue is *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Under the analysis set forth in *Renton,* a city has the right to regulate where adult businesses can be located due to the secondary effects associated with such businesses. *Renton,* 475 U.S. at 41, 106 S.Ct. at 925. *Renton* involved a zoning ordinance that prohibited adult movie theatres from locating within 1000 feet of any residential zone, single or multiple family dwelling, church, park, or school. 475 U.S. at 43, 106 S.Ct. at 926–27. After acknowledging that adult use ordinances do not fit neatly into either "content-based" or "content-neutral" categories, Justice Rehnquist, writing for the majority, concluded that a "content-neutral" analysis should be applied to an adult use ordinance that was enacted out of concern for secondary effects rather than to suppress free expression. *Renton,* 475 U.S. at 47, 106 S.Ct. at 928–29. Ultimately, Justice Rehnquist determined that inasmuch as the ordinance in question was not aimed at the content of the film shown in adult theatres, but rather at the secondary effects that these establishments imposed on the surrounding neighborhoods, the Court would apply a more deferential test—a content-neutral, time, place, and manner standard. *Renton,* 475 U.S. at 50–52, 106 S.Ct. at 930–31. The *Renton* Court noted that although the regulated establishments presented expressive activity, a deferential standard of review is appropriate because "society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate." *Renton,* 475 U.S. at 49 n. 2, 106 S.Ct. at 929 n. 2 (*quoting Young v. American Mini Theatres,* 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976)).

After concluding that the ordinance in *Renton* was content-neutral, the Court examined the ordinance to determine the substantial nature of the government's interest and the availability of reasonable alternative avenues of communication. *Renton,* 475 U.S. at 50, 53, 106 S.Ct. at 930, 931–32. First, the Court determined that the City's asserted interest in preventing crime, maintaining property values, and preserving the quality of the city's neighborhoods was important and substantial. *Renton,* 475 U.S. at 50, 106 S.Ct. at 930. The Court also found that the city was entitled to rely on the experiences and studies of other cities to demonstrate that adult businesses can have harmful effects on the community and that the effects are reduced by dispersing the establishments. *Renton,* 475 U.S. at 51, 106 S.Ct. at 930–31. The reduction of these secondary effects through zoning restrictions, which limit the location of these establishments, thus constituted a sufficient governmental interest. *Renton,* 475 U.S. at 51, 106 S.Ct. at 930–31. Finally, the Court evaluated whether *Renton's* ordinance provided reasonable alternative avenues of communication. Noting that more than 5% of the city's land area was available for potential adult entertainment sites,[8] the Court found that the City of Renton had sufficiently provided reasonable alternative avenues of communication. *Renton,* 475 U.S. at 53, 106 S.Ct. at 931–32.

Accordingly, the *Renton* Court upheld the ordinance. *Renton,* 475 U.S. at 50, 106 S.Ct. at 930. However, in so holding, the Court found it significant that the city did not ban adult theatres altogether, but merely prohibited their location. *Renton,* 475 U.S. at 46, 106 S.Ct. at 928 ("The *Renton* ordinance, like the one in *American Mini Theatres,* does not ban adult theatres altogether.") (*citing Amer. Mini Theatres,* 427 U.S. at 63 n. 18, 96 S.Ct. at 2449 n. 18).

■ Turning to the case at bar, the Court's first task is to determine whether the *Renton* time, place, and manner analysis is

8. This area consisted of 520 acres of "ample, accessible real estate," including "acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that [was] criss-crossed by freeways, highways, and roads." *Renton,* 475 U.S. at 53, 106 S.Ct. at 931–32.

applicable to § 264–91. At first glance, the resolution of this case seems largely dictated by *Renton* inasmuch as the Schenectady ordinance appears to disperse adult entertainment establishments through locational restrictions. However, in order for an adult use regulation to be upheld, it must be designed to serve a substantial governmental interest *and* must allow for reasonable alternative avenues of communication. *Renton,* 475 U.S. at 50, 106 S.Ct. at 930. No city may use zoning to totally ban such businesses or make it practically impossible to operate such a business within the city limits. *See Renton,* 475 U.S. at 54, 106 S.Ct. at 932; *Topanga Press v. City of Los Angeles,* 989 F.2d 1524, 1529–33 (9th Cir.1993). An adult business' First Amendment rights are violated when a local government effectively denies the adult business a reasonable opportunity to open and operate their enterprise within the city in question. *See Renton,* 475 U.S. at 54, 106 S.Ct. at 932; *Topanga Press,* 989 F.2d at 1529.

Here, the City of Schenectady allows the operation of adult entertainment establishments "subject to the issuance of a special permit as provided in Article XI in the G District and H District *only* and subject to the requirements hereinafter set forth." Schenectady City Code § 264–91 (emphasis added). In order for Schenectady's Zoning Law to be constitutional, the Court must first conclude that reasonable alternative locations exist within the G and H districts such that Plaintiffs have a reasonable opportunity to open and operate their enterprises within the City of Schenectady.

On this issue the record before the Court is woefully inadequate. Because neither party has submitted statistics on the availability of suitable sites within the G and H Zoning Districts, the Court is unable to ascertain if Schenectady's ordinance "allows for reasonable alternative avenues of communication." *Renton* 475 U.S. at 53, 106 S.Ct. at 932. Consequently, the Court cannot find that Plaintiffs have a likelihood of success on the merits as to their claim that § 264–91 is unconstitutional under this prong of the test articulated in *Renton.*

■ However, the Court must engage in an additional level of analysis because Schenectady has adopted a permit system that purports to allow adult businesses to operate in the specified zoning districts. In determining the constitutionality of a permit ordinance, a court must move beyond the *Renton* and *O'Brien* tests and deal with the issue of prior restraints. Unlike the zoning ordinance at issue in *Renton,* which merely required set distances between adult establishments, and unlike the Indiana statute at issue in *Barnes,* which banned public nudity, a conditional use ordinance acts as a prior restraint on speech; a permit scheme qualifies as a prior restraint because it essentially requires the permittee to obtain the government's permission or approval before engaging in an act of First Amendment protected speech. *See, e.g., FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 225, 110 S.Ct. 596, 604–05, 107 L.Ed.2d 603 (1990).

■ Although prior restraints are not *per se* unconstitutional, any system of prior restraint bears a heavy presumption against its constitutional validity. *See FW/PBS,* 493 U.S. at 225, 110 S.Ct. at 604–05. A system that endows a government official with unbridled discretion to determine who may speak and who may not, implicitly vests that governmental official with the power to regulate speech on the basis of its content and/or the viewpoint of the speaker. *See, e.g., City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 763–64, 108 S.Ct. 2138, 2147–48, 100 L.Ed.2d 771 (1988).

The Supreme Court has repeatedly struck down ordinances that make the enjoyment of constitutional freedoms contingent upon the uncontrolled will of a government official. *See, e.g., FW/PBS,* 493 U.S. at 226, 110 S.Ct. at 605; *Plain Dealer Publ. Co.,* 486 U.S. at 769–72, 108 S.Ct. at 2150–52 (striking down ordinance giving mayor authority to impose "terms and conditions deemed necessary and reasonable" in issuing permits for newspaper boxes); *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938–39, 22 L.Ed.2d 162 (1969); *c.f. Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 133–34, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992) (striking down parade

permit ordinance requiring that marchers pay unspecified fees to be determined by officials). Moreover, a licensing or permitting scheme must limit the time within which the government must issue the license and must provide for prompt judicial review. See FW/PBS, 493 U.S. at 224–27, 110 S.Ct. at 604–06 (1990) (licensing scheme for adult entertainment); Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (licensing scheme for adult movies). Lack of the procedural safeguards required by FW/PBS and Freedman raises grave questions about a permit or licensing scheme's constitutionality.

■ Accordingly, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license or permit must be declared unconstitutional unless it contains narrow, objective, and definite standards to guide the licensing authority. For example, in Dease v. City of Anaheim, 826 F.Supp. 336, 342 (C.D.Cal.1993), proprietors of adult businesses challenged the validity of the City of Anaheim's conditional use permit ordinance that applied to adult businesses. Under the Anaheim ordinance at issue in Dease, a permit could be denied if the Planning Commission found that the adult business would "adversely affect" the use of a church, school, park or playground; if the adult business was "insufficiently buffered" in relation to residential areas; or if the business' exterior appearance was "inconsistent" with the appearance of external structures in the neighborhood. Dease, 826 F.Supp. at 344. The Dease court concluded that the permitting scheme was invalid because the Planning Commission was vested with an unconstitutional amount of discretion in deciding whether to grant or deny the permit, leaving open the possibility of content-based discrimination because the Anaheim Planning Commission's decision-making was not guided by definite and objective standards. Dease, 826 F.Supp. at 344.

■ On this issue as well, the record before the Court is inadequate. Although § 264–91 makes reference to "Article XI" for the issuance of a special permit, neither party has deemed it important enough to actually submit Article XI of the Schenectady City Code. On the City's behalf, this is a critical omission because any system of prior restraint bears a heavy presumption against its constitutional validity. See FW/PBS, 493 U.S. at 225, 110 S.Ct. at 604–05.

Accordingly, the Court cannot ascertain if the permit/licensing scheme in use by the City of Schenectady contains narrow, objective and definite standards that eliminate any possibility for content-based censorship. Therefore, the Court must find that Plaintiffs have demonstrated a likelihood of success on the merits of their challenge to § 264–91, and thus the City should be enjoined from enforcing § 264–91. Accord, Santa Fe Springs Realty Corp. v. City of Westminster, 906 F.Supp. 1341, 1364 (C.D.Cal.1995) (issuing permanent injunction enjoining enforcement of adult entertainment permit scheme where standards were vague); Bukaka, Inc. v. County of Benton, 852 F.Supp. 807, 813 (D.Minn.1993) (finding permit scheme for adult establishments constitutionally suspect).

### C. Defendants' Cross–Motion for Summary Judgment

In addition to opposing Plaintiffs' Motion for a Preliminary Injunction, Defendants' submitted a Cross–Motion for Summary Judgment. However, Defendants' cross-motion is fatally flawed. Although a motion for a preliminary injunction is exempt from a number of the specific procedural requirements of Second Amended General Order 41, this does not mean that Second Amended General Order 41 can be completely disregarded. Second Amended General Order 41 states, in relevant part:

If a party opposing a motion wishes to file a cross-motion, such party shall prepare its notice of cross-motion, brief, affidavits and other supporting documentation as required by Local Rule 7.1. The notice of cross-motion shall not contain a return date. However, *no dispositive cross-motion shall be prepared by a party in response to a non-dispositive motion that has already been filed with the Court pursuant to Local Rule 7.1.*

Second Amended General Order 41, at 3 (emphasis in original).

Accordingly, Defendants' cross-motion was incorrectly filed and shall be deemed a nullity.

## III. CONCLUSION

In summary, Plaintiffs have shown both irreparable injury and a likelihood that they will succeed on the merits of their claims challenging the constitutionality of Schenectady's Public Amusement and Zoning laws. Therefore, a preliminary injunction should be issued enjoining the City of Schenectady from enforcing §§ 128–8 and 264–91 of the Schenectady City Code.

For the stated reasons, it is hereby **ORDERED** that Plaintiffs' motion for a preliminary injunction is GRANTED and that pending final judgment, Defendants, their agents, servants, employees, attorneys, and all persons in active concert and participation with Defendants are enjoined from commencing, maintaining, or otherwise taking action to enforce §§ 128–8 and 264–91 of the Schenectady City Code.

**IT IS SO ORDERED.**